480 P.2d 338

The BANK OF YUMA, an Arizona Banking Corporation, Appellant,

v.

ARROW CONSTRUCTION CO., an Arizona Corporation, Appellee.

No. 10164–PR.

Supreme Court of Arizona, In Banc.

Feb. 4, 1971.

John R. Hart, Yuma, for appellant.

Rolle & Jones by H. Stewart Bradshaw, Yuma, for appellee.

LOCKWOOD, Justice:

This case is before us on a petition to review a decision of the Court of Appeals, 12 Ariz.App. 466, 472 P.2d 77, reversing a superior court judgment in favor of the defendant, Arrow Construction Company. The decision of the Court of Appeals is vacated.

The facts appear as follows: Bemar Development Company decided to build a building in Yuma, Arizona to be known as "Crescent Center." To obtain funds for the project, it borrowed $750,000 from Investors Diversified Services, Inc. To make

sure that the money loaned went into the building, and that the building, when completed, would be clear of mechanics' liens, the mortgagee arranged for the funds to be placed in escrow with Phoenix Title and Trust Company.

The escrow instructions were executed January 6, 1965. They appear in the record as an exhibit attached to a deposition which was stipulated in evidence. The money in escrow was to be disbursed in stages (known as "draws") as the work progressed and was accepted as satisfactory. The instructions provided that the title company might "issue checks jointly to the builder, the contractor, the subcontractors, and/or materialmen or others, when" in the title company's sole discretion, it appeared necessary or advisable to do so.

The defendant Arrow Construction Company was the prime contractor; the subcontractor for the glass work was Edward Schnatzmeyer, d. b. a. Border Glass Company; the materialman who supplied the glass to the subcontractor was Pittsburgh Plate Glass Company. The plaintiff is the Bank of Yuma, hereinafter referred to as the bank.

From as early as 1963 the subcontractor was in debt to the bank, paying off some notes, renewing others, and borrowing more money, so that the balance owed to the bank throughout the events leading up to this lawsuit, fluctuated from $875 at its lowest point to over $24,000 at its highest point. On March 17, 1965 the subcontractor owed the bank slightly over $13,000. On that day the subcontractor secured his notes by assigning to the bank in writing, "all moneys now due * * * or which may hereafter become due * * *" by virtue of the subcontractor's contract to do the glass work for the prime contractor, at Crescent Center. The assignment stated that it was made as security for the payment of all indebtedness "now or hereafter owing from assignor to assignee." The amount expected to be received under that contract was $18,800 but with changes made

during construction, the amount was increased to nearly $24,000.

The assignment was presented to the prime contractor, who signed an "Acceptance" in the following words:

"The above and foregoing Assignment is hereby accepted, and the undersigned agrees to pay all moneys due under said contract, to the Bank of Yuma, located at Yuma, Arizona, with the understanding that acceptance of this assignment places no greater burden upon the undersigned than if this assignment had not been accepted, other than to pay such moneys due hereunder in the manner stated."

The work was eventually completed, and payment was made by the title company in the form of four checks as follows:

| | | |
|---|---|---|
| 1. | July 23, 1965 | $7,520.00 |
| 2. | September 9, 1965 | 3,760.00 |
| 3. | October 27, 1965 | 5,640.00 |
| 4. | May 3, 1966 | 6,717.76 |

Each check was made payable to: "Arrow Construction Company, Inc. & Border Glass Company, & Pittsburgh Plate Glass." Above the endorsements was written:

"By endorsement of this check the undersigned payees acknowledge payment in full, and waive all lien rights for labor or material furnished in erection of improvements on Crescent Central Project —Yuma for construction through * *."

followed by a specific construction date. Each check was endorsed by all three payees, and was deposited to the account of Pittsburgh Plate Glass Company.

In May of 1967 the bank made demand upon the prime contractor for the amount then owed to the bank by the subcontractor ($10,948.65 principal, plus accrued interest), and on November 8, 1967 the complaint was filed in this case. A trial was had before the court without a jury and judgment was rendered in favor of the defendant. No findings were requested or made.

584

The principal issue is whether the method of payment was such as to support the defendant contractor's position that it never received any funds for the use or benefit of the subcontractor and that on the contrary, the subcontractor was paid all sums due him under his subcontract from the construction money escrow by Phoenix Title & Trust Company.

The building was a $750,000 project of which approximately $24,000 represents the labor and material constituting the work set out in the glass subcontract. The vice president of the prime contractor testified that as each stage of the construction was accepted, a request for payment was made and the title company "made all disbursements not only to the various subcontractors and their suppliers, but to ourselves as a separate check." The checks to the subcontractor and Pittsburgh Plate Glass Company in the approximate amount of $24,000 also bore the prime contractor's name as co-payee, thus requiring the endorsement of all three companies. Without the addition of the prime contractor as a co-payee of the $24,000 the title company would not have a lien release from the prime contractor for the full cost of the project— $750,000. Clearly, therefore, the owner needed the prime contractor's receipt and lien waiver for the full amount.

The prime contractor's vice president testified that the funds were not delivered to him, but that "The checks were signed by me in the office of the Phoenix Title Company here in Yuma and they took it from there. I didn't handle the check in any way beyond that."

■ In our opinion, it is immaterial whether that vice president intentionally failed to see that the bank received payment under the assignment or whether he merely forgot that the funds represented by the checks, had been assigned to the bank. It was his duty to honor the assignment. The prime contractor could have specially endorsed the checks, payable to the order of the bank so that they could not be cashed without the bank's signature, or he could have made other arrangements to see that the bank received the money pursuant to the assignment. By endorsing the checks in blank the prime contractor gave up control over the payments, and, in effect, made payment to the subcontractor just as effectively as would be the case if it had received the cash and had asked the title company to deliver it to the subcontractor. The explanation that the prime contractor gives for not being liable to the bank—i. e., that it endorsed the checks in blank and didn't handle them after that—is the ground on which his liability rests.

The prime contractor, however, argues that the terms of his acceptance of the assignment relieved him of the necessity of specially endorsing the check, etc., because those terms provided that the assignment "places no greater burden on the undersigned than if this assignment had not been accepted." This argument is fallacious. When notice of an assignment is given to and received by the debtor, he becomes liable to pay to the assignee, whether he accepts the assignment or not. General Factors, Inc. v. Beck, 99 Ariz. 337, 342, 409 P.2d 40 (1965).

While the testimony does not clearly show the actual disposition of the funds, the fact that the checks, which represented them, were deposited to the account of Pittsburgh Plate Glass Company, after first being endorsed by the subcontractor, would seem to indicate that the subcontractor was indebted to Pittsburgh Plate Glass Company; that the title company, desiring to be sure that both companies waived their liens, procured the subcontractor's endorsements just as it had procured the prime contractor's; that the checks were then turned over to Pittsburgh Plate Glass Company, which also had to waive its lien in order to cash the checks. This means that the subcontractor received payment by a reduction in its debt to Pittsburgh Plate Glass Company.

■ The prime contractor also argues that the amount owed by the subcontractor to the bank, varied from time to time, and

that at one time, after the assignment, the balance was down as low as $875. It contends that the assignment secured only the lowest amount due at any time subsequent to the assignment. Its theory appears to be that since some of the amount due at the time of the assignment was paid, the assignment would secure only the reduced balance. There are two fallacies in this line of reasoning. (1) The reductions were not actually repayments but were only bookkeeping credits entered when notes which matured were replaced with renewal notes. In other words if the balance, for example, were $8,000 and a $2,000 note matured and was replaced with a new note for the same amount, a credit would be entered for $2,000, showing payment of the old note and a new balance of $6,000. The new note would immediately be charged to the account, bringing the balance back up to $8,000. This might make the note appear to be more current on the bank's books, but no money actually was received by the bank and the balance owed was never really decreased. (2) Even if *all* of the subcontractor's notes had been paid off, when the subcontractor again borrowed money, the assignment would then continue to secure the new debts. The assignment thus was a continuing security device for both present and future debts, as clearly indicated by its provision that it was to be security for all indebtedness "now or hereafter owing" to the bank.

■ The prime contractor also raises the issue of laches. There is no evidence in the record to show any laches. It does not appear when the bank first learned that the subcontractor had been paid. Likewise, there is no evidence that the delay in starting the suit has prejudiced the prime contractor. The prime contractor's answering brief states:

"There is evidence to support the theory that appellant took no steps to protect its claim for at least seventeen months, probably more. (See defendant's amended answer.) This is also undisputed in the record."

Allegations in pleadings are not evidence; they are statements of facts which the pleader must prove unless admitted by the opposing party. In the instant case, the prime contractor has complied with Rule 8(d), Rules of Civil Procedure, 16 A.R.S., which requires laches to be set forth as an affirmative defense. However Rule 8(e), Rules of Civil Procedure, provides that "Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided." The answer in the instant case is a "pleading to which no responsive pleading is required," Rule 7(a), Rules of Civil Procedure, and therefore the allegations of laches are deemed denied. The record reflects no evidence to support this defense.

■ Lastly, the prime contractor argues that since there were no findings of fact requested or made, we must give it the benefit of all reasonable inferences and must treat the case "as though the trial court had found every controverted issue of fact necessary to support judgment * * *." As an abstract statement of law, this is correct. They are, however, irrelevant to the case at bar in which there are no controverted issues of fact. The exact manner of disbursement of the funds by the owner, through the title company, through the prime contractor to the subcontractor, and his endorsing the checks and turning them over to his supplier, is not disputed. In issue is only the legal effect of what is conceded by all to have been done.

For the above reasons we hold that the defendant prime contractor breached his duty to see that the funds coming into his hands, belonging to the subcontractor on the Crescent Center job, were paid to the bank instead of to the subcontractor. It is therefore ordered that the opinion of the Court of Appeals is vacated, that the judgment of the superior court is reversed, and that the case is remanded to the superior court for entry of judgment in the sum of $10,948.65 with interest at the rate of 7½% from and after August 22, 1966.

STRUCKMEYER, C. J., HAYS, V. C. J., and UDALL, J., concur.

Note: Justice JAMES DUKE CAMERON did not participate in the determination of this matter.