570 P.2d 200

### The VALLEY NATIONAL BANK OF ARIZONA, a National Banking Association, Appellant,

v.

### FLAGSTAFF DAIRY, a partnership consisting of Frank Zanzucchi and Sarah A. Zanzucchi, his wife, and Paul Zanzucchi and Mary Roe Zanzucchi, his wife, Patrick Henry Zanzucchi, aka Hank Zanzucchi, John Doe II through V, and Mary Roe II through V, and Black Corporation I through V, Appellees.

No. 1 CA–CIV 3132.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 16, 1977.

Rehearing Denied Sept. 19, 1977

Review Denied Oct. 12, 1977

Rawlins, Ellis, Burrus & Kiewit by Redfield T. Baum, Phoenix, for appellant.

Moeller & Henry by James Moeller, Phoenix, for appellees.

## OPINION

HAIRE, Judge.

On this appeal the appellant bank contends that the trial court erred in entering summary judgment against it on the basis that, as a matter of law, the bank had no valid interest in certain accounts receivable which had been assigned to it by its borrower.

In the early 1970s the appellant bank began extending credit to one of its customers (Larry E. Brown) to finance the production of milk at his dairy. Brown thereafter sold a substantial portion of his milk production on a regular basis to the appellee, Flagstaff Dairy, although there were no contractual arrangements between Brown and Flagstaff Dairy which required that he do so.

In 1971, a financing statement executed by Brown granting to the bank a security interest in collateral of Brown, including but not limited to the right to receive payment from milk sales made by Brown, was duly filed and appropriately recorded. Further, in March 1973, again as collateral security for the milk production financing, Brown executed and delivered to the bank a "Security Agreement—Rights to Payment", whereby Brown granted to the bank a security interest in and right to collect "all monies due or to become due debtor [Brown] from the sale of milk." Immediately thereafter Brown delivered to Flagstaff Dairy a copy of the security agreement together with a notice of assignment, which directed Flagstaff Dairy to make Brown's milk payments directly to the bank.[1] Flagstaff Dairy did in fact thereafter pay directly to the bank the monies then due and owing to Brown, but on all subsequent milk sales, Flagstaff Dairy did not make the milk payments directly to the bank in accordance with the assignment, but rather made the payments to Brown or his designees (other than the bank).

At the time of Brown's financial collapse approximately one year later, the principal sum of his indebtedness to the bank was $43,188.10, and, subsequent to the time Flagstaff Dairy had received notice of the assignment and directions to pay to the bank, it had made milk payments to others in excess of the amount owed to the bank by Brown.

The present litigation resulted when the bank filed suit against Flagstaff Dairy on the theory that the bank had a valid assignment from Brown of Brown's right to receive the milk payments and that Flagstaff Dairy had wrongfully paid these accounts to Brown and other parties after receiving notification that the accounts had been assigned and that thereafter payments were to be made to the assignee bank.

---

1. There is a conflict in the evidence as to the facts relating to the notice given to Flagstaff Dairy. Inasmuch as this is an appeal from the trial court's granting of Flagstaff Dairy's motion for summary judgment, we have resolved all factual issues in favor of the bank, the party against whom the summary judgment was granted.

When notice of a valid assignment and direction to pay to the assignee is given to and received by an account debtor (here Flagstaff Dairy), the account debtor becomes liable to pay the assignee. *Greene v. Reed,* 15 Ariz.App. 110, 486 P.2d 222 (1971); *Bank of Yuma v. Arrow Construction Co.,* 106 Ariz. 582, 480 P.2d 338 (1971). An account debtor who disregards the assignment and thereafter pays the account to the assignor remains liable to the assignee. *Van Waters & Rogers, Inc. v. Interchange Resources, Inc.,* 14 Ariz.App. 414, 484 P.2d 26 (1971); *United Bank of Arizona v. Romanoski Glass & Mirror Co.,* 14 Ariz.App. 90, 480 P.2d 1007 (1971).

Flagstaff Dairy apparently does not dispute the validity of the foregoing legal principles. Its primary contention is that it cannot be held liable because the bank's security agreement could not create a security interest in Brown's future accounts receivable [2] so as to impose any obligation on Flagstaff Dairy, even though it received notification of the assignment and directions to pay all future accounts to the assignee bank. Therefore, it appears that the basic question for our determination is whether, under the law in effect in Arizona in 1973,[3] there could be a valid assignment of future accounts receivable as security for amounts loaned by the bank to its borrower.

Arizona decisions prior to the adoption of the Uniform Commercial Code have recognized that an assignment of a debt not yet due and which may never become due is effective if it appears that there is a then-existing contract or employment out of which the debt may arise at some future time. *Commercial Life Insurance Co. v. Wright,* 64 Ariz. 129, 166 P.2d 943 (1946). Although we have found no Arizona decision which has held invalid or ineffective an assignment of a future debt which was not based upon a then-existing contract, it is clear that under the common law such an assignment would have been ineffective. *See* Restatement of Contracts, Vol. 1, § 154 (1932).

Prior to the adoption of the Uniform Commercial Code in Arizona in 1967, Arizona had enacted an "Assignment of Accounts Receivable Act." *See* A.R.S. §§ 44–801 through 44–808 (Laws 1952, Chap. 132). Among other provisions, § 44–801 of that act defined "account receivable" or "account" as meaning an account "due or to become due" and as including "rights under an unperformed contract for work, goods or services which in the regular course of business will result in an open book account." Under the provisions of § 44–804 of that act, an assignment of such an account receivable (whether due or to become due) was recognized as creating valid rights. Arguably, the enactment of these pre-UCC Arizona statutory provisions represented an abrogation of the common law prohibition against the assignment of future accounts receivable. However, a close study of the definitional provisions of the now repealed Accounts Receivable Act (particularly § 44–801) leaves the question in doubt, particularly in the absence of any Arizona decisional law interpreting that act. Be that as it may, in our opinion the intent of the Uniform Commercial Code as adopted in Arizona in 1967 is clearly to the effect that a valid security interest can be created in future accounts receivable.

A.R.S. § 44–3117C (Laws 1967, Chap. 3, § 5), (1962 UCC, § 9–204) provides, with an exception not pertinent here, that ". . . a security agreement may provide that collateral, *whenever acquired,* shall secure all obligations covered by the

---

**2.** As used in this opinion, the term "future accounts receivable" is limited to the borrower's accounts receivable which came into existence after the execution by the parties of their security agreement, and which are not the result of any contract right which the borrower owned at the time the parties entered into the security agreement.

**3.** The pertinent laws in effect in Arizona in 1973 were derived from the 1962 Uniform Commercial Code as enacted in Arizona by Laws 1967, Chap. 3, § 5. Several pertinent statutory provisions were later amended substantially in accordance with the 1972 Uniform Commercial Code. *See* Laws 1975, Chap. 65.

security agreement." (Emphasis added). Section 44–3105(A)(3) (Laws 1967, Chap. 3, § 5), (1962 UCC § 9–105) states that "collateral" "means property subject to a security interest, and includes *accounts*." (Emphasis added). The comments to the 1962 UCC § 9–204, which is identical to A.R.S. § 44–3117 as in effect at the time of the transactions here involved, are particularly pertinent:

2. Subsections (1) and (3) read together make clear that a security interest arising by virtue of an after-acquired property clause has equal status with a security interest in collateral in which the debtor has rights at the time value is given under the security agreement.

\*  \*  \*  \*  \*  \*

That is to say: *the security interest in after-acquired property is not merely an "equitable" interest; no further action by the secured party—such as the taking of a supplemental agreement covering the new collateral—is required.*

3. This Article accepts the principle of a "continuing general lien" which is stated in Section 45 of the New York Personal Property Law and other similar statutes applicable to "factor's lien". It rejects the doctrine—of which the judicial attitude toward after-acquired property interests was one expression—that there is reason to invalidate as a matter of law what has been variously called the floating charge, the free-handed mortgage and the lien on a shifting stock. This Article validates a security interest in the debtor's existing and future assets, even though (see Section 9–205) the debtor has liberty to use or dispose of collateral without being required to account for proceeds or substitute new collateral.

\*  \*  \*  \*  \*  \*

The widespread nineteenth century prejudice against the floating charge was based on a feeling, often inarticulate in the opinions, that a commercial borrower should not be allowed to encumber all his assets present and future, and that for the protection not only of the borrower but of his other creditors a cushion of free assets should be preserved. That inarticulate premise has much to recommend it. This Article decisively rejects it not on the ground that it was wrong in policy but on the ground that it has not been effective. In the past fifty years there has been a multiplication of security devices designed to avoid the policy: field warehousing, trust receipts, "factor's lien" acts and so on. The cushion of free assets has not been preserved. In almost every state it is now possible for the borrower to give a lien on everything he has or will have. There have no doubt been sufficient economic reasons for the change. This Article, in expressly validating the floating charge, merely recognizes an existing state of things. The substantive rules of law set forth in the balance of the Article are designed to achieve the protection of the debtor and the equitable resolution of the conflicting claims of creditors which the old rules no longer give.

4. Subsection (2) states the time at which debtor has rights in collateral in specified cases. A security agreement may be executed and value given before the debtor acquires rights: the security interest will then attach under subsection (1), as to after-acquired property, when he does. Subsection (2) states when that is in several controversial cases. *Notice that the vexed question of assignment of future accounts is treated like any other case of after-acquired property: no periodic list of accounts is required by this Act.* Where less than all accounts are assigned such a list may of course be necessary to permit identification of the particular accounts assigned. (Emphasis added).

The principle that such an interest is valid is so well accepted that the questions which do arise are secondary to this underlying premise, *e. g.,* the adequacy of notice that the account has been assigned, *Bank of Salt Lake v. Corporation of President of Church of Jesus Christ of Latter-Day Saints,* 534 P.2d 887 (Utah 1975), the sufficiency of the description of collateral in the

security agreement, *In re Middle Atlantic Stud Welding Co.*, 503 F.2d 1133 (3d Cir. 1974); or whether the sums in question are accounts, so as to be included within the designation "accounts receivable", *Corpus Christi Bank & Trust v. Smith*, 512 S.W.2d 761 at 767 (Ct.Civ.App.Tex.1974).

A common concern is the priority of the lien on future accounts receivable as against the trustee in bankruptcy or a competing lien. As stated in *DuBay v. Williams,* 417 F.2d 1277 (9th Cir. 1969), discussing whether the lien on future accounts receivable must be set aside as a preferential transfer in a bankruptcy situation:

The validity of Rose City's floating lien on after-acquired accounts receivable arising prior to the four-month period preceding bankruptcy is unchallenged. Rose City's security agreement complied with the provisions of Oregon Commercial Code section 79.2040(3) (UCC § 9–204(3)) and its lien was perfected by filing its financing statement in accordance with section 79.4020 of the Code (UCC § 9–402). 417 F.2d at 1286, 1287.

■ The drafters of the Uniform Commercial Code have, of course, recognized that notwithstanding the existence of a security agreement covering after-acquired collateral and the giving of value by the creditor, a security interest cannot *attach* to the after-acquired collateral until the debtor himself (here, Brown) acquires rights in the collateral.[4] If there has been an agreement that it attach, and value has been given, the security interest attaches when the debtor acquires such rights, *e. g.,* in an account when it comes into existence. *See* A.R.S. § 44–3117B(4) (Laws 1967, Chap. 3, § 5). Although perfection of the security interest is unnecessary when considering

only the possible liability of an account debtor to the assignee, *see Manes Construction Co. v. Wallboard Coatings Co., Inc.,* 497 S.W.2d 334 (Ct.Civ.App.Tex.1973),[5] if the other applicable steps for perfection of the security interest (such as filing) have been undertaken before the after-acquired collateral comes into existence, then the security interest is perfected at the time the collateral comes into existence and the debtor acquires rights in it. *See* A.R.S. § 44–3124 (Laws 1967, Chap. 3, § 5).

■ Appellee Flagstaff Dairy's contention that there can be no valid security interest created in future accounts receivable is predicated upon the provisions of A.R.S. § 44–3139C (Laws 1967, Chap. 3, § 5) (1962 UCC § 9–318) as follows:

C. The account debtor is authorized to pay the assignor until the account debtor receives notification that the account has been assigned and that payment is to be made to the assignee.

Referring to the definitions of "account debtor" and "account" and "contract right" found in A.R.S. §§ 44–3105A(1) and 44–3106 (Laws 1967, Ch. 3, § 5), Flagstaff Dairy points out that these definitions speak in the present tense, and from this infers that § 44–3139C evidences an intent to limit the assignee bank's rights against the contract debtor (here Flagstaff Dairy) to those accounts or contract rights which were in existence at the time the security agreement was entered into or notice given. In view of the plain intent of the after-acquired property provisions previously discussed in this opinion, we reject such a strained construction. In our opinion the purpose of the above-quoted language in § 44–3139C was not to identify or limit the collateral which might be made the subject

---

4. *See* 1962 UCC § 9–204; A.R.S. § 44–3117 (Laws 1967, Chap. 3, § 5).

5. Quoting from *Manes Construction Co. v. Wallboard Coatings Co., Inc., supra:*

"[p]riorities are not in issue. Manes could only question whether National's security interest had *attached.* Tex. Bus. & Comm. Code Ann. sec. 9–204 (1968). No such question has been raised. Moreover, the judgment rendered by the trial court is not based

on a foreclosure of National's security interest. It is based on a finding that Manes, the account debtor, paid money directly to the assignor, American, at a time when Manes had actual notice of the assignment to National. In so doing, Manes subjected itself to double liability. Tex.Bus. & Comm.Code Ann. sec. 9.318(c) (1968)." A.R.S. § 44–3139(C), 497 S.W.2d at 337.

 
of a valid assignment. The provision does not purport to be an affirmative delegation specifying all the rights of an assignee. Rather, as indicated in the 1962 UCC comments to that section, the purpose was to clarify the right of an account debtor (here Flagstaff Dairy) to continue to make payments directly to the assignor until the receipt by the account debtor of notice or direction to make future payments directly to the assignee, notwithstanding the fact that the account debtor might have had prior notice or knowledge that the collateral had been assigned.

We thus conclude that the trial court erred in its finding that the bank's assignment was unenforceable against Flagstaff Dairy because no valid security interest could be created in future accounts receivable. Therefore, the summary judgment entered in favor of Flagstaff Dairy must be reversed. In arriving at this conclusion we have considered and rejected the possibility that the provisions of the Uniform Commercial Code which allow the creation of valid security interest in future accounts receivable should be limited in effectiveness to questions involving priorities between competing creditors or lienholders and not be effective insofar as concerns rights between the account debtor and the assignor. In our opinion any such interpretation would not only do violence to the obvious intent expressed in the provisions of the code, but in addition would ignore commercial realities. Common law principles which cast doubt on the effectiveness of an assignment of rights under future contracts do so on the ground that until the contract has been made, the assignee has at the most an "equitable" interest which must be converted into a "legal" interest by some new act (which might well be the delivery of a new instrument of assignment) after the making of the contract. Current commercial practice makes wide use of liens on accounts receivable, which by their intrinsic nature fluctuate both as to amount and the debtors obligated. To hold, as Flagstaff Dairy urges, that a new assignment and notice must be given separately to the account debtor as each sum

becomes due would impose a substantial burden and expense on accounts receivable financing. A.R.S. § 44–3139C itself provides protection for the account debtor who is uncertain whether to pay the assignor debtor or the financing assignee. When an account debtor who is engaged in a regular course of dealing with the assignor has been properly notified that he is to pay future accounts receivable directly to the secured party, we can ascertain no purpose to be served by increasing the notification requirements beyond those contained in the code itself so as to require successive assignments and notices as each account arises.

The judgment in favor of Flagstaff Dairy is reversed, and the matter is remanded for determination of the factual issues relating to notice and the various affirmative defenses raised by Flagstaff Dairy.

NELSON, P. J., and DONOFRIO, J., concurring.