885 P.2d 186

**PAVILION HOTEL, INC., an Arizona corporation, and Pavilion Services, Inc., an Arizona corporation, Plaintiffs-Counter-defendants/Third Party Defendants–Appellants,**

**v.**

**The VALLEY NATIONAL BANK OF ARIZONA, a national banking association, Defendant, Counter-claimant/Third Party Plaintiff–Appellee,**

and

**The Mutual Life Insurance Company of New York, a New York corporation, Third Party Defendant, Third Party Plaintiff–Appellee.**

No. 1 CA–CV 92–0056.

Court of Appeals of Arizona,
Division 1,
Department B.

Nov. 17, 1994.

Warnicke & Littler by Thomas E. Littler, Phoenix, for appellants.

Snell & Wilmer by Lonnie J. Williams Jr., Patricia A. Kirtley, Phoenix, for appellees.

## OPINION

WEISBERG, Presiding Judge.

This lawsuit involves several bank accounts held at Valley National Bank of Arizona ("VNB") in the name of Pavilion Hotel, Inc. ("PHI") and Pavilion Services, Inc. ("PSI"). Mutual Life Insurance Company of New York ("MONY") claims that it is entitled to the accounts pursuant to a security agreement between it and PHI. PHI and PSI appeal the granting of summary judgment in favor of MONY and the discharge of garnishee VNB from liability.

## FACTS AND PROCEDURAL HISTORY

In 1985, a joint venture sought to construct and operate a hotel in Mesa, Arizona. In

August 1985, MONY agreed to loan the funds needed for construction, approximately $20,000,000; the borrower was PHI, to which the joint venture transferred all its assets and liabilities. PHI executed a security agreement in which it gave MONY a security interest in "[a]ll rights and interest of the Debtor in Hotel bank accounts, and all other accounts, accounts receivable or sums belonging to or payable or becoming payable to Debtor under or by reason of operation of the Hotel." PHI also executed a Note and a "Deed of Trust and Assignment of Rents and Security Agreement" (collectively, "D.O.T."). The D.O.T. was secured by the real property, together with, *inter alia:*

(a) the reversion or reversions, remainder and remainders, rents, issues and profits thereof, which are now due or may hereafter become due by reason of the renting, leasing and bailment of said property, the improvements thereon and the Equipment.

The D.O.T. also provided for an assignment of "[a]ll rents and profits of the premises and the right, title and interest of the Trustor in and under all leases now or hereafter affecting the premises."

Another corporation, PSI, was created by the same joint venture to operate the hotel. PSI leased the hotel from PHI beginning October 1, 1985. The lease required PSI to pay its operating expenses and trade payables, and then pay the balance of its receipts to PHI.

PHI subsequently defaulted on the loan and MONY began foreclosure proceedings. After voluntarily dismissing the foreclosure action, MONY attempted to enforce its rights through a nonjudicial sale of the hotel. Before the sale could occur, PHI filed for bankruptcy. In February 1988, MONY filed a motion in bankruptcy court to prohibit the use of cash collateral and to sequester rents. Pursuant to a stipulation, the bankruptcy court entered an order requiring PSI to pay its actual and necessary expenses, and then to pay "[a]ll other cash, monies or other income generated by the operator of the hotel, whether pre-petition or post-petition" to PHI. PHI was required to segregate these funds in a separate account until further order of the court.

In November 1988, following a motion by MONY, the bankruptcy court ordered a freeze on all bank accounts in the name of PHI or PSI maintained at VNB. In October 1989, before any action was taken on the frozen accounts, PHI's bankruptcy was dismissed.

In February 1990, PHI and PSI filed a complaint against VNB seeking damages for breach of contract and declaratory relief. VNB filed an answer and counterclaim, together with a third-party complaint against MONY, seeking to interplead the funds that were the subject of the complaint and to discharge it from any liability to PHI or PSI. MONY filed its answer to the third-party complaint and a complaint against PHI and PSI.

In June 1990, VNB requested leave to deposit the disputed funds with the court and moved for its discharge. The court granted leave to deposit the funds with the court and subsequently entered an order discharging VNB from further liability.

In March 1991, MONY filed a motion for partial summary judgment asserting that it had a security interest in, and was therefore entitled to, the VNB accounts. In May 1991, the trial court granted the motion for partial summary judgment and ordered that the funds in the accounts be turned over to MONY. In September 1991, the parties entered into a stipulation dismissing all remaining claims. This appeal followed.

## DISCUSSION

### A. *MONY's Security Interest*

#### 1. Security Agreement

■ PSI first argues that it was not a party to the security agreement between PHI and MONY, and therefore MONY cannot have a security interest against PSI's bank accounts. *See* Ariz.Rev.Stat.Ann. ("A.R.S.") § 47–9203(A) (1988) (security interest attaches only if debtor has signed security agreement, value has been given, and debtor has rights in the collateral); *General Elec. Credit Corp. v. Tidwell Indus.*, 115 Ariz. 362, 364, 565 P.2d 868, 870 (1977). MONY does not contend that PSI was a

party to the security agreement, but instead argues that the security agreement is effective against PSI as the transferee of collateral subject to a security interest. *See* A.R.S. § 47–9306(B) ("security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party").

PHI and MONY executed a security agreement and a UCC financing statement granting MONY a security interest in the following:

[a]ll of Debtor's interest and rights as lessor in and to all leases now or hereafter affecting the said real property or any part thereof and/or all rental income whether payable pursuant to any present or future lease or otherwise, *growing out of any occupancy or use* thereof; Agreement for Assignment of Liquor License dated July ___, 1985 between Pavilion Services, Inc. and Secured Party, joined in by Debtor.

*All rights and interest of the Debtor in Hotel bank accounts, and all other accounts, accounts receivable or sums belonging to or payable or becoming payable to Debtor under or by reason of the operation of the Hotel.*

(Emphasis added.)

■ At the time of perfection, the operation of the hotel, and all revenues generated therefrom, belonged to PHI. The security agreement granted MONY a security interest in all sums *becoming payable* due to the operation of the hotel. Thus, MONY'S security interest included all future revenues from hotel operations. Such future acquired interests can validly be included in a security agreement. *See Valley Nat'l Bank v. Flagstaff Dairy,* 116 Ariz. 513, 518–19, 570 P.2d 200, 205–06 (App.1977) (valid security inter-

est in future account receivables). Accordingly, when operational income was generated, the security interest in favor of MONY attached to the resulting funds. *See id.; Valley Nat'l Bank v. Cotton Growers Hail Ins. Inc.,* 155 Ariz. 526, 529, 747 P.2d 1225, 1228 (App.1987) (security interest attaches to contingent right to receive crop insurance proceeds and defeats insurers right to set-off).

PSI's lease of the hotel operation did not affect the security interest already attached. The only means for removing the perfected security interest would have been to file a release of collateral executed by MONY. *See* A.R.S. § 47–9406. Although the lease transferred to PSI the right to operate the hotel, the security interest had already been perfected and the lease was subordinate to MONY's security interest. Therefore, when the operational revenues were generated, the security interest attached, and that security interest defeats PSI's claim under the lease.

Although PSI points to testimony indicating that MONY was aware that it would operate the hotel pursuant to the lease, it fails to point to any provision of the security agreement exempting or releasing the secured collateral.[1] Accordingly, we agree with the trial court that MONY's security interest attached to PSI's accounts.[2]

## 2. Bankruptcy Did Not Void MONY's Security Interest

### a. Section 552.

■ PHI and PSI argue that the bankruptcy code requires that the accounts acquired following the filing of the bankruptcy petition ("after-acquired property") be free

---

1. Since neither PHI nor PSI argued below that they "reasonably expected" that the hotel revenues would not be subject to MONY's security interest, we do not consider such an argument now. *See Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 393–94, 682 P.2d 388, 398–99 (1984) (in boilerplate agreement, even unambiguous terms of an agreement will not defeat parties reasonable expectations). Instead, we focus on what the parties have contested: the extent of the security interest and the effects of the bankruptcy proceeding.

2. We note that PSI makes the argument that the security agreement refers only to the "interest *of the Debtor (PHI)* in Hotel bank accounts" (emphasis added), and that, therefore, MONY's interest cannot attach to *PSI's* interest in such accounts. We however, do not read the above-emphasized language as language of limitation. Rather, we view it as an all-inclusive description of PHI's interest in Hotel accounts at the time the security agreement was perfected. This language does not act to render MONY's security interest ineffective upon PHI's future transfer of its rights in such accounts.

from MONY's security interest. They rely upon the following provision of the bankruptcy code:

> Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

11 U.S.C. § 552(a). Thus, the bankruptcy code may operate to render a security agreement ineffective as to any after-acquired property. PHI and PSI argue that the accounts at issue are after-acquired property and, therefore, cannot be subject to MONY's security interest.

MONY does not dispute that these accounts primarily arise from after-acquired property. Instead, it argues that subsection (b) of section 552 sets forth an applicable exception:

> [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law. . . .

11 U.S.C. § 552(b). MONY argues that these accounts are "proceeds" and, therefore, the § 552(a) cut-off does not apply.

### b. Are hotel revenues proceeds?

MONY cites A.R.S. section 47–9306(D) of the Arizona Uniform Commercial Code ("AUCC") as authority for characterizing these accounts as section 552(b) proceeds. This subsection, however, neither defines nor describes *what* constitutes proceeds. It merely specifies *which* proceeds are *traceable* and therefore still possibly subject to a

security interest. "Proceeds," however, is defined elsewhere.

Under the AUCC, "proceeds" is defined as "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." A.R.S. § 47–9306(A). Thus, we must determine whether any portion of the accounts arise out of property acquired before the filing of the bankruptcy petition ("before-acquired property") that has been converted into some other form. This approach is bolstered by the congressional comment on § 552(b): "The term 'proceeds' is not limited to the technical definition of that term in the U.C.C., but covers any property into *which property subject to the security interest has been converted.*" H.R.Rep. No. 595, 95th Cong., 1st Sess. 376–77 (1977) (emphasis added) 1978 U.S.Code Cong. & Admin.News 5787, 6332, 6333 (quoted in 4 *Collier on Bankruptcy,* ¶ 552.02, at 552–7 (Lawrence P. King ed., 15th ed. 1994)).

The accounts in the instant case could consist of money arising out of hotel operations conducted both before and after the filing of the bankruptcy petition. To the extent such funds represent the post-petition payment of pre-petition accounts receivable, or sales of secured pre-petition personal property, they are "proceeds" under the AUCC, and, because they are not cut off by section 552(a), are therefore secured [3]. *Cf. In re Airport Assocs., Ltd.,* 132 B.R. 951, 956–60 (Bankr.D.Colo.1990) (although post-petition payment of hotel's pre-petition accounts receivable are "proceeds," and are thus secured, security interest does not extend to accounts receivable generated post-petition); *see also In re Investment Hotel Properties, Ltd.,* 109 B.R. 990, 997 (Bankr. D.Colo.1990) (creditor "has a security interest in hotel room revenues, accounts receivable, *in existence as of the date of the petition* and the proceeds derived from those accounts" (emphasis added)). Thus, if after filing a bankruptcy petition, a debtor sells a secured item of personal property, or collects on a secured account receivable, the secured

---

**3.** Any cash in the accounts that had been received prior to the filing of the bankruptcy petition would, of course, be before-acquired property and therefore unaffected by the section 552(a) cut-off.

creditor would still have a security interest in the after-acquired proceeds that could be traced under A.R.S. section 47–9306(D). In this case, however, much of the hotel revenues do not appear to arise from such prepetition assets. To the extent they do not, we hold that such post-petition hotel revenues are not proceeds.

### c. Hotel room revenue is rent.

■ Although the funds in these accounts may not be "proceeds," they would be similarly excepted from the bankruptcy cut-off if they constitute "rent" under § 552(b). MONY did not argue this position at the trial court or in its original brief on appeal and, generally, we would not reach the issue.[4] "This rule, however, is procedural and not jurisdictional. If application of a legal principle, even if not raised below, would dispose of an action on appeal and correctly explain the law, it is appropriate for us to consider the issue." *Evenstad v. State,* 178 Ariz. 578, 875 P.2d 811, 815 (1993) (citations omitted).

■ Several courts have considered whether hotel revenues are "rent" under § 552(b), and their conclusions have varied. *Compare In re Thunderbird Inn, Inc.,* 151 B.R. 224, 226–227 (Bankr.D.Ariz.1993) (holding that hotel revenues are not rent) *and In re General Assoc. Investors Ltd. Partnership,* 150 B.R. 756, 762 (Bankr.D.Ariz.1993) (holding that hotel revenues are not rent) *with In re Everett Home Town Ltd. Partnership,* 146 B.R. 453, 458 (Bankr.D.Ariz.1992) (holding that hotel revenues are rent); *see also In re Days California Riverside Ltd. Partnership,* 27 F.3d 374, 377 (9th Cir.1994) (hotel room revenues are "rent"); *In re Northview Corp.,* 130 B.R. 543, 546 n. 4, 548 (Bankr.9th Cir.1991) (hotel revenues are "accounts" not "rent"); *In re Green Corp.,* 154 B.R. 819, 823–24 (Bankr.D.Me.1993) (hotel revenues are not rent); *In re S.F. Drake Hotel Assocs.,* 131 B.R. 156, 160, 161 (Bankr. N.D.Cal.1991) (hotel revenues are rent), *aff'd,* 147 B.R. 538 (N.D.Cal.1992). Since this question is ultimately determined by state law, *see Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979), and is of first impression in Arizona, this Court is free to make its own conclusion as to the nature of the hotel revenues.

The conclusions reached by the many courts considering this issue depend upon their adoption of either a technical or practical view of what is rent. Courts that find hotel revenues are not rent rely on a more technical and restrictive definition: that rent is only payment in a traditional landlord-tenant relationship. Because hotel guests are not "tenants," *see State v. Carrillo,* 26 Ariz.App. 113, 114, 546 P.2d 838, 839 (1976), these courts reason that they are not paying rent, *see General Assoc. Investors,* 150 B.R. at 759. Characterizing hotel revenues as "accounts," *see Northview,* 130 B.R. at 546 n. 4, 548, these courts have held that hotel revenues arise from the payment of a license to use a room, which is essentially goods or services, and therefore are not rental for leased property. We, however, disagree with this technical view.

We acknowledge that Arizona hotel guests have been viewed as licensees with a right to the use of a room, as distinguished from tenants, who have an interest in the realty as well as the exclusive possession of the premises. *See Carrillo,* 26 Ariz.App. at 114, 546 P.2d at 839. We fail to agree, however, that distinctions between the status of persons entitled to occupy real property should determine whether hotel room revenues constitute rent. Both tenants and guests or licensees are required to compensate the landowner for the use of the premises. The differing rights and obligations of a tenant versus a licensee relate to the care and control of the property, not to how the landowner is to be compensated. These labels affixed to property users were not developed to assist in commercial financing arrangements. "It would make little sense for [a state] to import into the area of hotel credit either statutory or common law distinctions developed with very different purposes in mind." *Days California,* 27 F.3d at 377. We, therefore, do not adopt the technical approach when determining what constitutes "rent."

The other approach is one of practicality, best enunciated by the court in *S.F. Drake*

---

4. Because it appeared this issue might be dispositive, we ordered supplemental briefs on it.

*Hotel Assocs.* In that case, the court noted that hotel room revenues were primarily compensation for the use of the real property, not the accompanying services. *S.F. Drake Hotel Assocs.*, 131 B.R. at 160–61; *see also Everett Home Town,* 146 B.R. at 457.

> Any services that a hotel provides are incidental to room occupancy. The hotel guest's primary objective is shelter. That shelter is provided by the land and improvements of the hotel. A hotelier cannot operate a hotel without the real property and improvements, no matter what the extent of services provided.

*S.F. Drake Hotel Assocs.*, 131 B.R. at 159. The court went on to conclude that a better foundation for determining whether room revenues are "rent" generated by real property "is the common understanding of rent as compensation for use of property which, taken with the knowledge that a lodger primarily seeks shelter not service, leads to the conclusion that room revenue is rent." *Id.* at 160–61.

Other sources support this conclusion, as well. *Black's Law Dictionary* defines rent as "[c]onsideration paid for use or occupation of property." *Black's Law Dictionary* 1297 (6th ed. 1990). Also, the Arizona legislature's use of the term "rent" appears to be in accord with this broad definition. Although "rent" as used in a commercial setting has not been defined by statute or case law,[5] the term has been used by the legislature to identify revenue that a hotelier collects from its guests. For example, the statute addressing an innkeeper's lien grants a hotelier a lien upon the baggage and other property of its guests "for charges due for accommodation, board, lodging or *room rent.*" A.R.S. § 33–951 (emphasis added); *see also Elkhart Inv. Corp. v. Gazin,* 24 Ariz.App. 246, 248, 537 P.2d 974, 976 (1975). Additionally, hoteliers are given a credit against a county hotel excise tax for monies paid under the "municipal occupational license tax based on a percentage of the *rent* [the hotel] charges." A.R.S. § 42–1496(B) (emphasis added). Clearly, then, Arizona statutes recognize that

the room revenues a hotel generates can be termed "rent."

We, therefore, adopt a broader definition of rent that denotes compensation for the use of real property, whether or not the payment has been made in a landlord-tenant relationship. We hold that, under Arizona law, the definition of "rent" includes compensation for the use of real property and encompasses revenues from the use of hotel rooms. Thus, to the extent that PHI and PSI's bank accounts consist of after-acquired room revenues, they are rent and not subject to the § 552(a) cut-off.

### d. Intent of the parties.

Holding that room revenues are rent is consistent with the intent of the parties to create a pervasive security interest. The UCC security agreement gave MONY a security interest in all "sums belonging to or payable or becoming payable to Debtor under or by reason of operation of the Hotel," including "all of Debtor's interest and rights as lessor in and to all leases now or hereafter affecting the said real property or any part thereof and/or all rental income whether payable pursuant to any *present or future* lease or otherwise, *growing out of any occupancy or use* thereof." (Emphasis added).

Accordingly, the parties intended that MONY be given a lien in virtually all of debtor's assets, including all future operational revenues derived from operation of the hotel. That includes hotel room revenues. To remove the room revenues from the security interest would be to unfairly reduce the value of MONY's collateral. We see no compelling reason to defeat the clearly stated intent of the parties.

### e. Revenues from goods and services are not rent.

■ We further conclude, however, that to the extent these accounts represent payments for goods or services, rather than for the use of real property, they are not "rent" but "accounts." *See Days California,* 27 F.3d at 377; *Everett Home Town,* 146 B.R.

---

5. Rent is defined in the Residential Landlord and Tenant Act as "payments to be made to the

landlord in full consideration for the rented premises." A.R.S. § 33–1310.

at 456, 457. After finding that hotel room revenues were rent, the court in *Days California* continued:

> [W]e do not hold that in California all of a hotel's revenues are rent. The revenues derived from the sale of food and drink and from other services provided by the hotel generate 'accounts' that cannot be classified as rent. The equitable purposes of bankruptcy and the balancing purpose of § 552 require us to distinguish the two types of revenues.

27 F.3d at 377 (citations omitted). Accordingly, any portion of the accounts that represent payment for goods or services, such as food and beverage sales, are not rent and, therefore, are cut off by § 552(a).

The extent to which PHI and PSI's accounts contain revenues from goods and services is unclear from the record. The accounts include the total amount of revenues from hotel operations less the necessary operating expenses. PHI and PSI contend that the accounts included monies from the "entire bundle of services" provided by the hotel, including revenues from restaurants and bars. An estimated cash flow analysis included in the record indicates that the hotel receives substantial revenue from food and beverage services, accounting for almost as much revenue as that produced by room rates. Since the record does not indicate what portion of the accounts represent such revenues, we must remand for a factual determination of what portion is unsecured because it arises from goods and services.

### 3. Dismissal of Bankruptcy Petition Does Not Reinstate Lien

■ MONY also argues that, even if the bankruptcy code effectively cut off its security interest in any portion of the accounts, the dismissal of the bankruptcy petition reinstates or revests its security interest. PHI and PSI counter that the lien reinstatement section of the bankruptcy code does not refer to liens avoided under § 552(a) and, therefore, the dismissal has no effect on this case. The relevant portion of the bankruptcy code provides:

> Unless the court, for cause, orders otherwise, a dismissal of a case . . .

(1) reinstates—

> (A) any proceeding or custodianship superseded under section 543 of this title;

> (B) any transfer avoided under section 522, 544, 545, 547, 548, 549, or 742(a) of this title, or preserved under section 510(c)(2), 522(i)(2), or 551 of this title; and

> (C) any lien avoided under section 506(d) of this title;

(2) vacates any order, judgment, or transfer ordered, under section 522(i)(1), 542, 550, or 553 of this title; and

(3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.

11 U.S.C. § 349(b). This provision does not specifically indicate what effect dismissal would have on liens cut off by § 552(a).

Several bankruptcy courts have considered this issue, coming to opposite conclusions. *Compare In re Newton,* 64 B.R. 790, 792–93 (Bankr.C.D.Ill.1986) (dismissal does *not* reinstate liens avoided under § 552(a)) *with In re Kucera,* 123 B.R. 852, 854–55 (Bankr.D.Neb. 1990) (dismissal *does* reinstate liens avoided under § 552(a)); *see also In re Mulberry Chesterton Inn, L.P.,* 142 B.R. 566, 567–68 (Bankr.S.D.Ga.1992) (dismissal does not reinstate); *In re Depew,* 115 B.R. 965, 970–71 (Bankr.N.D.Ind.1989) (§ 349(b) only operates on sections specifically enumerated); *United States v. Standard State Bank,* 91 B.R. 874, 878–79 (Bankr.W.D.Mo.1988) (§ 349(b) does not reinstate government tax lien), *aff'd on other grounds,* 905 F.2d 185 (8th Cir.1990); *In re Blackwelder Furniture Co.,* 31 B.R. 878, 881 (Bankr.W.D.N.C.1983) (reorganization plan reinstates liens avoided under § 552(a)).

Although the parties have not cited these cases, they have argued the underlying policy. The argument for reinstatement is based upon the fundamental purpose of § 349(b). As noted in several of the cited cases, § 349(b) is intended to "undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement

of the case." H.R.Rep. No. 595, 95th Cong., 1st Sess. 338 (1977) 1978 U.S.Code Cong. & Admin.News 6294. Reinstatement follows this general purpose. Such courts find, presumably under § 349(b)(3), that the avoided security interests are property interests that can be revested at the time of dismissal, placing the parties back to the position they would have occupied absent the bankruptcy.

The argument against reinstatement is statutory. Many courts have pointed out that § 349(b) sets forth several specific sections that are operated on by dismissal: for instance, reinstating liens voided under section 506(d) (concerning allocation of secured claims for undersecured creditors). They reason that Congress made the policy determination of what could practicably be undone by § 349(b) and that, if Congress had intended § 349(b) to operate on liens avoided under § 552(a), it easily could have included § 552(a) in the enumerated sections.

While both parties offer compelling arguments, we are more persuaded by the cases holding that § 349(b) operates only on those sections enumerated. MONY has not provided any reasonable construction, nor can we make such a construction, that interprets § 349(b) as reinstating liens cut off by § 552(a). Congress directly addressed the issue of which liens were to be reinstated upon dismissal and did not mention those voided under § 552(a). This indicates to us that the clear legislative intent was to exclude them. Most courts that have considered the issue have come to this conclusion. *See* 2 *Collier on Bankruptcy* § 349.03, at 349–11 to 349–12. Moreover, Congress has had ample opportunity to amend § 349(b) and has not done so. Therefore, we conclude that § 349(b) neither reinstates or revests a lien cut off by § 552(a). Thus, to the extent PHI and PSI's bank accounts represent revenues from goods and services, MONY's interest is cut off.

### B. Discharge of VNB from Liability

 PHI and PSI also argue that the trial court erred by discharging VNB after it deposited the disputed funds with the court. *See* Ariz.R.Civ.P. 22(b). Appellants argue that, while A.R.S. section 6–233 gives banks discretion to freeze deposit accounts for a reasonable time to permit judicial resolution of competing claims, *see Arizona Bank v. Wells Fargo Bank, N.A.,* 148 Ariz. 136, 139–40, 713 P.2d 337, 340–41 (App.1985), VNB had the duty to institute litigation to provide that resolution.

 PHI and PSI do not cite any law that places such a duty upon a bank. The majority rule cited by this court in *Arizona Bank* is that a bank can freeze an account "so as to allow *the adverse claimant to institute a lawsuit." Goldstein v. Riggs Nat'l Bank,* 459 F.2d 1161, 1163 n. 3 (D.C.Cir.1972) (emphasis added) (cited in *Arizona Bank,* 148 Ariz. at 140, 713 P.2d at 341). An affirmative duty simply has not been placed upon a garnishee bank.

In the instant case, appellants could have filed their lawsuit at any time after notice of the adverse claim. After they did, VNB appropriately moved for interpleader and discharge under Rule 22. We hold that the trial court correctly discharged VNB.

### CONCLUSION

MONY's security interest attached to the subject accounts before PHI filed bankruptcy. To the extent these accounts include after-acquired revenues from goods and services, MONY's lien on the accounts was voided by PHI's bankruptcy, pursuant to § 552(a), and was not reinstated by § 349 after the dismissal of PHI's bankruptcy. However, to the extent they represent before-acquired cash or accounts receivable, or after-acquired room revenues, MONY's lien survives the bankruptcy petition. This case, therefore, is remanded for a determination of the origin of the funds in the accounts and other proceedings consistent with this decision. In addition, because PHI and PSI failed to establish that VNB had any duty to initiate proceedings concerning the accounts, we affirm the trial court's discharge of VNB.

TOCI and CONTRERAS, JJ., concur.