**U.S. BANK TRUST NATIONAL ASSOCIATION, By and Through Metropolitan Bank and Trust,**

v.

**NIELSEN ENTERPRISES MD, et al**

No. CIV. L–99–753.

United States District Court, D. Maryland.

Oct. 18, 2002.

Lawrence J. Gebhardt, Gebhardt and Smith LLP, Baltimore, MD, Edward E. Sharkey, Dickstein Shapiro Morin and Oshinsky LLP, Washington, DC, for U.S. Bank Trust Nat. Ass'n, plaintiff.

David F. Albright, Sr., Albright and Goertemiller, LLC, Baltimore, MD, Kristi LeFaivre Anderson, Semmes Bowen and Semmes, PC, Baltimore, MD, for Nielsen Enterprises MD, LLC, defendant.

Richard M. Kremen, Charles Kevin Kobbe, Piper Rudnick, LLP, Baltimore, MD, for Venice MD, LLC, Hagerstown Maryland, LLC, defendants.

Paul Walter, Tydings and Rosenberg LLP, Baltimore, MD, for Compass Capital Corp., Barry C. Smith, defendants.

Shirlie N. Lake, R. Scott Krause, Eccleston and Wolf PC, Baltimore, MD, for Lawrence S. Conn.

David F. Albright, Sr., Albright and Goertemiller, LLC, Baltimore, MD, Kristi LeFaivre Anderson, Semmes Bowen and Semmes PC, Baltimore, MD, Jonathan Ruckdeschel, Parker Dumler and Kiely LLP, Baltimore, MD, for Brian K. Nielsen, Teresa R. Nielsen, defendants.

### MEMORANDUM OPINION

LEGG, District Judge.

This is a diversity action brought by Metropolitan Bank and Trust ("Metropolitan" or "the Bank") on behalf of Plaintiff

U.S. Bank Trust National Association. There are nine Counts in the Second Amended Complaint and a single issue in the Amended Counter-Complaint which are still viable. By separate Order, JUDGMENT will be ENTERED as follows:

- for the Plaintiff, against Venice MD, LLC, and Hagerstown Maryland, LLC, on the following Counts of the Complaint:
  — Count V (declaratory judgment that the forfeiture was invalid)
  — Count IX (conversion);
  — Count X (breach of covenant of quiet enjoyment);
  — Count XI (breach of third party provisions in the lease agreement);
  — Count XII (interference with a contract).
- for the Plaintiff on the Defendants' counter-claim to offset the back taxes paid on the liquor license.
- for the Defendants on the following Counts of the Complaint:
  — Count III (declaratory judgment regarding rent payment due dates);
  — Count IV (specific performance of the Lease);
  — Count VI (equitable subrogation);
  — Count VII (equitable recharacterization); and
  — Count XIII (Fraud).

The Clerk will be DIRECTED to CLOSE the CASE.

## I. BACKGROUND

The factual background in this case is complex. Prior to the trial, the parties submitted a joint chronology and a "cast of characters," both of which have been adopted verbatim by the Court and are included below. The bench trial began on January 14, 2002, and continued for nine days. At the conclusion of the trial, the Court provided the parties with an eighteen page outline of its findings of fact and reviewed the outline with the parties at a hearing. At the Court's request, the parties, without conceding any of their trial positions, collaborated to produce a draft statement of facts.

In the instances where the parties were unable to agree on a joint submission, the Plaintiff submitted its suggested findings in bold type, and the Defendants submitted their suggested findings in italics. The Court held two additional hearings to resolve the remaining conflicts, and tailored the parties' language as it found appropriate. On October 10, 2002, the Court held oral argument on the conclusions of law. Pursuant to a letter sent to Counsel by the Court, argument centered on the following issues:

(i) equitable subrogation of the Plaintiff to the mortgage of First National Bank and Trust Company;

(ii) equitable recharacterization of the Ground Lease as a mortgage;

(iii) the Defendants' interference with the contract between Mr. Nielsen and Compass Capital;

(iv) the Plaintiff's right to receive gross revenues under § 9–306 of the Maryland UCC, and the Defendants' right to offset their expenditures;

(v) the damages to be assessed against the Defendants for wrongfully ousting the Plaintiff. Specifically, the measure of damages for:

(a) the breach of the covenant of quiet enjoyment;

(b) the breach of the third party beneficiary provisions under Article 14 of the Ground Lease;

(c) the Defendants' conversion of the Plaintiff's personal property collateral; and

(d) whether the conversion should be viewed as a trespass because the Defendants relinquished the personal property on October 1, 1999;

(vi) whether the money paid to and/or promised to Mr. Nielsen in consideration for waiving his right of redemption is collateral subject to the Plaintiff's security interest;

(vii) attorneys' fees;

(viii) punitive damages; and

(ix) Andrew Shapiro's personal liability.

## A. Cast of Characters

The Cast of Characters lists entities and people, alphabetically arranged and consecutively numbered, and attempts to give a brief identifying description of each person.

### 1. Entities

1. **American Corporate Real Estate, Inc.**—Real estate broker which put Nielsen and Shapiro together.

2. **Ballard, Spahr, Andrews & Ingersoll**—Represented Landlord in connection with Venice Inn transaction in 1998.

3. **Baxter, Baker, Sidle & Conn**—Represented Landlord from early March 1999 to approximately June 1999.

4. **Best Western International, Inc.**—National hotel chain which formerly was franchisor of Venice Inn property.

5. **BPA Commercial Capital, L.L.C.**—Entity which acquired and transferred mortgage loans, including Nielsen Enterprises loan, in connection with November 1998 securitization.

6. **Carmel Pacific Financial**—Mortgage broker which referred Nielsen to Compass Capital.

7. **Chicago Title Insurance Company**—Title company that closed Venice Inn transaction.

8. **Compass Capital Corporation**—A Defendant and a mortgage broker owned by Barry Smith. Originated and sold Nielsen Enterprises loan to Metropolitan.

9. **First National Bank & Trust Company**—Lender to prior owner of Venice Inn which held $3.2 million first mortgage on Venice Inn real estate that was satisfied in connection with April 1998 transaction.

10. **Guaranteed Title & Escrow Company**—Company which acted as escrow agent under April 1999 Agreements.

11. **Hagerstown Maryland, LLC.**—A Defendant and one of the constituent entities in the Landlord.

12. **Horizon Hotels**—Hotel Management Company retained by Metropolitan to replace Prime Hospitality in December 1999. Currently managing property.

13. **Lodging Unlimited, Inc.**—Hotel management company retained by Landlord to operate Venice Inn upon takeover by Landlord on March 9 or 10, 1999.

14. **Metropolitan Bank & Trust Company**—Plaintiff on behalf of U.S. Bank Trust, Trustee.

15. **Meyers, Young, Grove & Thomas**—Hagerstown law firm which represented Nielsen interests in connection with Venice Inn transaction.

16. **Miller, Oliver, Moylan & Stone**—Hagerstown law firm which represented Vidoni interests in connection with Venice Inn transaction.

17. **Nielsen Enterprises LLC**—Limited liability company created by Nielsen to hold Venice Inn liquor license. Debtor under Metropolitan security agreement to pledge liquor license.

18. **Nielsen Enterprises Md, LLC**—Purchaser of Venice Inn personal prop-

erty, principal borrower under $5.9 million loan and tenant under Ground Lease.

19. **Nielsen Properties, Inc.**—Corporation owned by Brian Nielsen. Party to March 1999 Agreement with Landlord.

20. **Prime Hospitality Corp.**—Hotel Management company retained by Landlord to replace Lodging Unlimited in June 1999. Managed property for Landlord from June 1999 through September 1999. Managed property for Metropolitan from October 1999 through November 1999.

21. **Thompson, Hine & Flory**—Law firm which represented Metropolitan in February 1999 and March 1999.

22. **Tydings & Rosenberg**—Represented Compass Capital in Venice Inn transaction.

23. **U.S. Bank Trust National Association**—Trustee under a securitization of commercial mortgage loans into which Nielsen Enterprises loan was placed.

24. **Venice MD LLC.**—A Defendant and one of the constituent entities in the Landlord.

25. **Venice Inn LLC**—Limited liability company formed by Metropolitan to hold interest in Venice Inn property as a result of the ratified foreclosure sale.

26. **Venice Motel and Restaurant, Inc.**—Entity that operated Venice Inn business and owned all personal property prior to April 1998 transaction.

27. **Venice Venture Limited Partnership**—One of two entities that owned Venice Inn real estate prior to April 1998 transaction.

28. **Vidoni Limited Partnership**—One of two entities that owned Venice Inn real estate prior to April 1998 transaction.

## 2. People

29. **Judy Z. Adam**—Former C.F.O. of Metropolitan.

30. **Eric Allen**—Indiana attorney who represented Nielsen in March 1999.

31. **Alan W. Adamson**—Ballard Spahr attorney representing Landlord in connection with Venice Inn transaction.

32. **Lloyd W.W. Bell, Jr.**—Former Senior Vice President and Chief Lending Officer of Metropolitan and member of loan committee which approved Nielsen Enterprises loan.

33. **Joseph F. Bencevinga**—Hotel manager employed by Lodging Unlimited to manage Venice Inn. Continued by Prime Hospitality and Horizon Hotel. Worked at Venice Inn while under control of both Landlord and Metropolitan.

34. **Timothy R. Billick**—Former in-house attorney for Metropolitan who worked on Venice Inn transaction.

35. **Edward Button**—Hagerstown attorney appointed receiver pursuant to foreclosure proceeding in Circuit Court for Washington County.

36. **Robert J. Carson**—Attorney representing Landlord from early March 1999 to approximately June 1999.

37. **Jack E. Christopher**—Former Senior Portfolio Manager at Metropolitan involved in servicing of Nielsen Enterprises loan.

38. **Sheryl Christopherson**—Relationship Specialist Manager for U.S. Bank Trust.

39. **Lawrence S. Conn**—Attorney at Baxter, Baker, Sidle & Conn who represented Landlord from early March 1999 to approximately June 1999.

40. **James DeFalco**—Broker for American Corporate Real Estate.

41. **Bernard P. Dietzel**—Former Vice President of Metropolitan and supervisor of Metropolitan servicing depart-

ment. Mailed $50,000 check to Shapiro on March 10, 1999.

42. **Dennis Duffy**—Expert appraisal witness retained by Landlord.

43. **Charles E. Edwards**—Metropolitan workout officer having contact with Brian Nielsen in January 1999 and early February 1999.

44. **Scott A. Fenske**—Attorney at Thompson, Hine & Flory who represented Metropolitan in February 1999 and March 1999.

45. **Nancy R. Ferrell**—Expert witness retained by Metropolitan on subject of Compass Capital fee.

46. **David Glass**—Representative of Lodging Unlimited.

47. **Stephen H. Greenfeld**—Represented Nielsen from February 1999 to approximately September 1999.

48. **E. Kenneth Grove, Jr.**—Represented Nielsen in connection with Venice Inn transaction.

49. **Robert A. Jones**—Illinois attorney who represented Nielsen in February 1998 and March 1998.

50. **Walter C. Buck@Jones**—Representative of Chicago Title who handled closing of Venice Inn transaction.

51. **Robert M. Kaye**—Chairman of Metropolitan and member of loan committee which approved Nielsen Enterprises loan.

52. **Sean M. Keane**—Metropolitan Underwriter for Nielsen Enterprises loan.

53. **Patrick C. Kerr**—Expert appraisal witness retained by Metropolitan.

54. **Kenneth T. Koehler**—President of Metropolitan.

55. **Craig Kolasinski**—Former Metropolitan loan officer who handled most of Metropolitan's business with Barry Smith prior to his departure.

56. **James E. Lignelli**—Appraiser who appraised Venice Inn in connection with

April 1998 transaction; also retained by Metropolitan as expert witness in this case.

57. **Donna K. Leesman**—Human Resources Manager at Metropolitan.

58. **Andrew Lombardi**—CPA exert witness retained by Metropolitan on subject of revenues of Venice Inn while in possession of Landlord.

59. **Henry P. Lorber**—Expert witness retained by Compass Capital on subject of Compass Capital fee.

60. **Richard E. Lowrey**—Expert witness retained by Landlord on subject of value of Venice Inn personal property.

61. **Steven Brent Lynch**—Expert witness retained by Metropolitan on subject of value of use of Venice Inn personalty by Landlord while Venice Inn was in possession of Landlord.

62. **Michael Mandelbaum**—New Jersey attorney and principal of Hagerstown Maryland LLC.

63. **Brian K. Nielsen**—Principal of Nielsen Enterprises Md, LLC, Nielsen Enterprises LLC and Nielsen Properties, Inc.

64. **Teresa R. Nielsen**—Wife of Brian K. Nielsen.

65. **Richard W. Norton**—Representative of Lodging Unlimited.

66. **Toni S. Perkins**—Commercial Real Estate Loan Closer for Metropolitan who worked on Nielsen Enterprises loan.

67. **Andrew E. Shapiro**—A Defendant and principal of Venice MD LLC. Point person for Landlord.

68. **Kenneth A. Shapiro**—Georgia attorney and brother of Andrew Shapiro. Represented Landlord with Ballard Spahr in April 1998 Venice Inn transaction and in connection with April 1999 lease termination.

69. **Marci Shapiro**—Wife of Andrew Shapiro.

70. **David Slezak**—Current Metropolitan General Counsel.

71. **Barry C. Smith**—Defendant and owner of Compass Capital Corporation.

72. **James W. Stone**—Hagerstown attorney who represented Vidoni interests in Venice Inn transaction.

73. **J. Walter Thomas**—Former Metropolitan Loan Officer for Nielsen Enterprises loan.

74. **Vidoni Family**—Original owners of Venice Inn, whose various members own interests in Vidoni Limited Partnership, Venice Venture Limited Partnership, and Venice Motel and Restaurant, Inc.

75. **Paul Walter**—Tydings and Rosenberg attorney who represented Compass Capital in connection with Venice Inn transaction.

76. **David O. Whitman**—Tydings & Rosenberg attorney who represented Compass Capital in connection with Venice Inn transaction.

77. **Eric Witmondt**—Principal of Hagerstown Maryland, LLC.

78. **Michael Witmondt**—Brother of Eric Witmondt who was involved in takeover of possession of Venice Inn by Landlord.

79. **Rosemary A. Yaecker**—Former Underwriter and Assistant Manager of Commercial Lending at Metropolitan.

80. **William P. Young, Jr.**—Hagerstown attorney who represented Nielsen interests in Venice Inn transaction.

81. **Terry Zisman**—Mortgage broker with Carmel Pacific.

## B. Chronology

March 3, 1998—Smith faxes possible new loan transaction to Lloyd Bell.

March 17, 1998—Metropolitan loan committee approves Nielsen Enterprises loan subject to certain conditions.

April 10–13, 1998—Closing of Nielsen Enterprises acquisition of Venice Inn for $8.5 million and Compass Capital's $5.9 million loan and assignment to Metropolitan; Landlord makes contribution of $2.5 million for real estate and enters into Ground Lease with Nielsen Enterprises.

April 16, 1998—Tydings & Rosenberg forwards to Metropolitan binder of documents without Chicago Title settlement statement referencing $750,000 payment to Compass Capital.

April 24, 1998—Compass Capital notifies Nielsen Enterprises that Metropolitan holds loan.

November 30, 1998—Metropolitan places Nielsen Enterprises loan in $100 million pool of commercial mortgages for securitization.

December 1, 1998—Nielsen Enterprises defaults under Metropolitan loan.

January 22, 1999—Metropolitan declares Nielsen Enterprises in default.

January 26, 1999—Nielsen tells Metropolitan of $750,000 payment to Compass Capital and faxes a copy of Chicago Title settlement statement to Metropolitan

February 1, 1999—Nielsen Enterprises fails to make a $25,000 rent payment claimed by Landlord to be due under Ground Lease.

February 6, 1999—Bell visits with Nielsen at Venice Inn to review situation.

February 17, 1999—Landlord issues default notice based on failure to make February 1, 1999 payment.

March 2, 1999—Landlord issues additional default notice specifying March 9, 1999 as last day for cure of February 1, 1999 payment default.

March 2, 1999—Kenneth Shapiro contacts Conn regarding representation of Landlord.

March 3 or 4, 1999—Andrew Shapiro contacts Nielsen.

March 9, 1999–Date of two Agreements between Landlord and Nielsen Enterprises/Nielsen Properties.

March 9 or 10, 1999—Landlord takes possession of Venice Inn.

March 10, 1999—Metropolitan mails $50,000 check to Shapiro.

March 11, 1999—Shapiro returns $50,000 check to Metropolitan and advises that Landlord has terminated the Ground Lease and taken control of the Venice Inn.

March 17, 1999—Metropolitan files suit against Landlord and others; Judge Black presides at emergency hearing and denies Metropolitan's request for appointment of Receiver.

September 15, 1999—Initial foreclosure sale of Metropolitan's interests in Venice Inn; Sale not ratified because of settlement between Metropolitan and Landlord which provided for reinstatement of Ground Lease on October 1, 1999.

October 1, 1999—Effective date of settlement between Metropolitan and Landlord pursuant to which Metropolitan pays approximately $370,000 to Landlord under protest and Landlord turns over possession of Venice Inn to Metropolitan.

October 6, 1999—Receiver appointed upon Metropolitan's request by Circuit Court for Washington County.

October 15, 1999—Date scheduled for hearing on Metropolitan's motion for preliminary injunction and writ of replevin.

February 17, 2000—Actual foreclosure sale of Metropolitan's interests in Venice Inn; Sale later ratified by Circuit Court for Washington County

## II. FINDINGS OF FACT
### THE VENICE INN

1. The Venice Inn, located in Hagerstown, Maryland, is a full service hotel/motel complex, containing a bar, banquet and meeting facilities, and a restaurant known as Avelinos. Also located within the Venice Inn complex is a liquor store. In addition to the hotel/motel complex and related facilities, the Venice Inn complex also contains commercial space leased to various third party tenant/vendors. Historically, the Venice Inn operated under a Best Western franchise and reservation system. The presence of the Best Western flag and reservation system was crucial to the success of the Venice Inn.

2. Prior to April of 1998, the Venice Inn was owned and operated by the Vidoni family. The Venice Inn real estate consists of two contiguous parcels of land and the improvements located thereon. One parcel was owned by Venice Venture Limited Partnership; the other, by Vidoni Limited Partnership. The business and all of the personal property and operating assets were owned by Venice Motel and Restaurant, Inc. The Vidoni family owned all three entities.

3. Because the Venice Inn contained a bar and restaurant, a liquor license was essential to the operation of the Venice Inn. Venice Motel and Restaurant, Inc. held the liquor license issued by the Board of License Commissioners for Washington County, Maryland.

4. In 1997, the Vidoni family decided to sell the Venice Inn. To this end, the Venice Inn was listed for sale with The Michaels Company, a Maryland commercial real estate brokerage. In connection with the sale, the Vidoni family commissioned an appraisal of the Venice Inn by Barone,

Murtha, Shoneburg & Associates, Inc. This appraisal valued the Venice Inn as of July 4, 1997 at $7,750,000 in fee simple and as a going concern with a Best Western franchise. Included in this appraisal was all of the furniture, fixtures, and equipment, to which the appraiser allocated $440,000 of the total appraised value. The Vidoni family provided this appraisal to the broker and financial information on the operation of the hotel, including the hotel's net operating income.

5. The Michaels Company compiled an information package from the materials provided by the Vidonis and advertised the hotel for sale in *The Wall Street Journal.*

### BRIAN K. NIELSEN

6. Brian K. Nielsen is a businessman from the Springfield, Illinois area. He was engaged in real estate investment activities and owned and operated some residential rental properties, apartment buildings, and strip shopping centers in Illinois. Mr. Nielsen lacked a substantial net worth or any significant liquidity. He and his wife had filed for bankruptcy in 1994. Mr. Nielsen's formal education was limited, and he did not progress beyond the 9th grade in school. He had no training or experience in the ownership or management of hotel properties.

7. Nielsen came upon *The Wall Street Journal* advertisement for the Venice Inn and decided to acquire and operate the property. To this end, he contacted The Michaels Company and entered into active negotiations for the purchase of the property.

8. Based on his lack of financial wherewithal and his inexperience and background in the ownership and operation of a hotel, Nielsen was not qualified either to purchase or to operate the Venice Inn. He was outside of his depth in pursuing the purchase of the Venice Inn and in attempting personally to operate the hotel following his acquisition of it.

### CARMEL PACIFIC AND COMPASS CAPITAL

9. To finance his contemplated purchase of the Venice Inn, Nielsen contacted Terry Zisman of Carmel Pacific, a California mortgage broker who had helped him finance some of his real estate investments. Zisman, in turn, contacted Barry Smith of Compass Capital Corporation, an Arizona mortgage broker, as a financing source for Nielsen.

10. Compass Capital was in the business of brokering existing mortgage loans. Compass Capital would locate a lender that wished to sell either an individual mortgage or a portfolio of mortgages and would negotiate a selling price. Compass Capital would then locate another lender that was in the market to purchase loans and attempt to negotiate a sale with the prospective purchaser. If a price could be agreed upon, Compass Capital would simultaneously purchase from the seller and sell to the buyer the mortgage loan or loans. Compass Capital would profit by the spread between what it was paying the seller and what it was receiving from the buyer.

11. Although Compass Capital's original proposal was to purchase the Nielsen loan from Carmel Pacific, it became obvious that this procedure would not work for the Nielsen/Venice Inn transaction. For this reason, Compass Capital agreed to make, rather than Carmel Pacific, the loan to Nielsen Enterprises. Compass Capital, however, had no funds to actually make a substantial mortgage loan and had to obtain some funding source for the contemplated transaction. Compass Capital had never before sold to Metropolitan a mortgage originated by Compass.

12. To obtain a source of funding for the Nielsen/Venice Inn transaction, Barry Smith contacted Lloyd Bell, a Senior Vice President and the Chief Lending Officer of Metropolitan Bank and Trust, a savings bank located in Cleveland, Ohio, on or around March 2, 1998. Smith and Compass Capital had done substantial business in the past with Metropolitan, although not with Bell, who had recently joined the Bank. This business involved Metropolitan's purchasing mortgage loans from Compass Capital which Compass Capital had purchased in a simultaneous transaction from another lender. Smith was well thought of at Metropolitan, which had had a good experience in dealing with Compass Capital and Smith. None of the other parties to the final Venice Inn transaction had any prior dealings with Compass Capital or Smith.

13. The proposed transaction being presented by Compass Capital to Metropolitan was different from any prior transactions between the two. Compass Capital proposed that it would make the loan to Nielsen in the name of Compass Capital and immediately transfer the loan to Metropolitan at closing. Metropolitan would wire funds to closing to enable Compass Capital to fund the loan it was making. Metropolitan acquiesced in Compass Capital's request to structure the transaction as a purchase by Metropolitan of a loan made by Compass Capital rather than as a loan made directly by Metropolitan to Nielsen.

14. The exact relationship between Metropolitan and Compass Capital in this transaction was not before the Court. In a co-pending case, Compass Capital has contended that this relationship was that of a buyer and seller of a loan, whereas Metropolitan has contended that the relationship was one of broker (i.e. agent) to principal.[1] The Court makes no finding as to the specific relationship which existed between Metropolitan and Compass Capital in the Nielsen Enterprises transaction.

15. Although the Court makes no finding as to the specific nature of the relationship between Metropolitan and Compass Capital, the Court does find that no other parties to the transaction in which Nielsen acquired the Venice Inn in April of 1998 were aware of the involvement of Metropolitan and that all of the information received by Metropolitan came through the filter of Compass Capital. Metropolitan's involvement was not known to other parties until April 24, 1998, when Smith notified Nielsen by letter that Compass Capital had sold the loan to Metropolitan. The negotiations of the transactional documents were conducted by Smith and attorneys from Tydings & Rosenberg (the law firm representing Compass Capital), with the input of Timothy Billick (Metropolitan's in-house counsel).

16. The transaction proposed by Compass Capital was a $5.9 million loan to finance the purchase of the Venice Inn by Nielsen. The loan would be for a five year term and carry an interest rate of 10% per annum. The loan would be secured by a first mortgage on the leasehold estate under an unsubordinated land lease and by all of the other assets and property associated with the hotel.

17. Bell assigned the task of reviewing the proposed loan to J. Walter Thomas, who headed a loan production office for Metropolitan in Pittsburgh, Pennsylvania. Thomas, like Bell, had not had prior dealings with Compass Capital or Smith, but

1. Because Compass Capital and Smith filed for bankruptcy, Metropolitan's claims against them were not tried.

was aware of his good history with the Bank.

## NIELSEN AND SHAPIRO

18. Because the proposed $5.9 million dollar loan would not provide all of the money needed by Nielsen to purchase the Venice Inn, Nielsen sought additional financial assistance to complete the transaction. To obtain additional money, Nielsen placed an advertisement in *The Wall Street Journal* soliciting financial assistance. This advertisement came to the attention of James DeFalco, a New York real estate broker with American Corporate Real Estate, Inc. DeFalco contacted Andrew Shapiro, a New Jersey real estate investor. DeFalco wrote to Shapiro inquiring of his interest in purchasing the land comprising the Venice Inn for $2 million and then leasing it to Nielsen under a long-term unsubordinated net ground lease for a rent of $20,000 per month. Shapiro indicated his willingness to advance $2 million on the basis of an unsubordinated net land lease, a proposal that was acceptable to Nielsen.

## THE LANDLORD'S TRANSACTION

19. After initial discussions with Nielsen, Shapiro arranged for the participation of Michael Mandelbaum and Eric Witmondt. For his part of the transaction, Shapiro and members of his family formed Venice MD LLC, a Georgia limited liability company and a Defendant. For their part, Mandelbaum and Witmondt, on behalf of various family trusts, formed Hagerstown Maryland LLC, a New Jersey limited liability company and also a Defendant. Under the arrangement, the Shapiro side would supply 20% and the Mandelbaum/Witmondt side 80%. Venice MD LLC and Hagerstown Maryland LLC will be collectively referred to as the Landlord. Throughout the transaction and the events which followed and eventually led to this litigation, Andrew Shapiro was the point person acting on behalf of and with the authority and approval of the Landlord.

20. As originally proposed and contemplated, the Landlord was to advance $2 million toward the purchase price of the Venice Inn and would receive in exchange fee simple title to the land, but not the improvements. The eventual transaction involved the sale of real estate from the Vidoni partnerships to the Landlord, and the lease of the real estate by the Landlord to Nielsen.

21. The initial drafts of the Ground Lease provided that the term of the land lease would be 50 years with periodic renewal options thereafter carrying the potential term to 99 years. Rent would be based on a 12% return on the $2 million advance and was set at $240,000 per year, or $20,000 per month, with periodic escalators of the rent. The tenant would have the right to pay down the lease by $1 million and thereby reduce the rent due. There was, however, no right on the part of the tenant to redeem the fee simple interest from the land lease. The land lease was to be a net-net lease, with all of the obligations and expenses of ownership being the responsibility of the tenant.

22. Because the parties knew that the tenant's interest and estate under the land lease would be subjected to a mortgage from a lender providing financing for the purchase of the hotel, the Ground Lease drafts all contained provisions customarily required by leasehold lenders intending to extend financing on the security of a leasehold estate created under a ground lease. This included provisions providing the lender with notice and opportunity to cure the tenant's defaults and prohibiting the landlord from agreeing with the tenant to any amendment, modification, or termination of the lease or surrender of the

leasehold estate without the lender's consent, unless the Ground Lease had been terminated following notice and an opportunity to cure. The leasehold lender was to be a third party beneficiary of these provisions of the Ground Lease. Although a leasehold mortgage was at all times contemplated, the land lease was to be unsubordinated, meaning that the lender's mortgage would create a lien or encumbrance only on the tenant's leasehold interest and would not apply to or encumber the Landlord's fee simple interest.

23. As with many commercial transactions of this type, the proposed transaction between the Landlord and Nielsen had features common to financing transactions and common to purchases of real estate. Metropolitan contends the transaction was, in reality, a financing similar to a mortgage and should be treated as such so that the Ground Lease can be redeemed, whereas the Landlord contends that the transaction was the purchase of real estate and should be treated as an absolute conveyance which is not subject to redemption.

## THE LANDLORD'S DEAL CHANGES

24. The initial drafts of the Ground Lease were prepared by Kenneth Shapiro, Andrew's brother and a Georgia lawyer. The Landlord also was represented by Alan Adamson and the Maryland office of the firm of Ballard, Spahr, Andrews and Ingersoll. Ballard Spahr participated in the negotiations and drafting of what became the final version of the Ground Lease.

25. The $2 million land advance was not enough for Nielsen to complete the purchase and pay the closing fees and costs. He asked Shapiro, and Shapiro agreed on behalf of the Landlord, to increase the Landlord's advance by $500,000, to the sum of $2.5 million. This occasioned an increase in the annual rent to $300,000 and the monthly rent to $25,000.

26. In addition to the increase in the Landlord's advance and the rent due, other changes were made in the Ground Lease, principally based on the suggestions of Adamson. The term of the lease was changed from 50 years, with renewal options, to seven years, with the tenant having 13 seven year renewal options, making the total potential term 98, rather than 99 years. Shortening the term to 98 years was for the purpose of making the lease non-redeemable under *Md. Code Ann. Real Prop. Art.'* 8–110 (which makes leases for a term of 99 years redeemable at 6%). The rent escalators were set at every 5 years and provided for a 10% increase. The tenant was no longer permitted to make a pay down that would reduce the rental obligation.

27. Another change recommended by Adamson involved ownership of the improvements on the land. Title to the improvements upon the land was expressly changed from being owned by the tenant to being owned by the Landlord. This change was agreed to by Nielsen. Placing title to the improvements in the landlord did not affect the fundamental economics of the Landlord's deal, which were based on the 12% return and the security of the Ground Lease.

## WHAT THE REAL ESTATE IS WORTH: DIFFERENT APPROACHES TO VALUE

28. The Venice Inn has been valued at different times under different approaches.

29. As mentioned, in 1997, Barone, Murtha, Shoneburg & Associates, Inc. was engaged by the Vidonis and appraised the Venice Inn as of July 4, 1997, at $7,750,000 in fee simple and as a going concern. Included in this appraisal was all of the

furniture, fixtures, and equipment, to which the appraiser allocated $440,000 of the total appraised value. A Best Western franchise existed at the property at the time of the appraisal.

30. On April 3, 1998, James Lignelli of Diversified Evaluation Company was selected by Metropolitan and engaged by Compass Capital to appraise the Venice Inn in connection with the Compass Capital/Metropolitan loan. He valued the fee simple interest in the Venice Inn on a going concern basis, as of March 20, 1998, at $8,641,000. His appraisal was based upon financial information on the Venice Inn supplied by the Vidonis and was conditioned upon the continuation of the Best Western franchise. The appraisal did not reflect the Ground Lease or the Landlord's $2.5 million advance because Walter Thomas of Metropolitan requested a fee simple appraisal and Lignelli had no knowledge of the Ground Lease or its terms. Lignelli testified that he would have reduced the appraised value by $2.681 million if he had been made aware of the Ground Lease and been asked to value the tenant's leasehold estate.

31. The contract of sale for the Venice Inn specified that the $8.6 million purchase price was to be allocated on the basis of $6 million to the real estate (owned by the two limited partnerships) and $2.6 million to the personal property and operating assets (owned by the operating corporation). The seller, however, had the unilateral right to change the allocation.

32. There was a first mortgage on the Venice Inn real estate at the time of closing in favor of First National Bank and Trust Company with an approximate unpaid principal balance of $3.2 million.

33. The deed executed by the selling partnerships recited a purchase price of $5.9 million and the selling partnerships (not the buyer) paid the entire transfer and documentary stamp tax which was due based upon this consideration.

## THE VALUE OF THE REAL ESTATE AS BEING EQUAL TO THE VALUE OF THE GROUND LEASE.

34. Metropolitan called as an expert appraisal witness Patrick Kerr. According to Kerr, the value of the Landlord's ownership of the Ground Lease equals the value of the rental stream over the potential lease term plus the security for the payment of this rental stream. The residual value of the land at the expiration of the potential 98 year term under the Ground Lease, in his view, is worth very little.

35. Kerr, in valuing the Landlord's ownership of the Ground Lease, testified that in 1998 a capitalization rate of between 9 and 9.5 % would have reflected the fair market value of the rental stream and the security of the payment of that rental stream, as opposed to the 12% capitalization rate which the $300,000 per year rental stream actually afforded the Landlord. According to Kerr, the value of what the Landlord received in the Ground Lease was between $3.15 to $3.3 million, as compared to the $2.5 million plus costs the Landlord actually advanced.

36. James Lignelli, testified that, based on a $300,000 income stream, he would subtract $2.681 million from his valuation to account for the Landlord's interest under the Ground Lease.

37. Hence, the value of what the Landlord received for its $2.5 million advance was a stream of income under the Ground Lease worth between $2.681 to $3.3 million. This difference between what was advanced and what was received did not amount to the Landlord receiving a windfall. This disparity between what was advanced and what was received did not

constitute an unjust enrichment of the Landlord.

## METROPOLITAN

38. In 1998, Metropolitan was a bank experiencing rapid growth. Lloyd Bell had recently joined the Bank as a senior vice president and chief lending officer. Under Bell's supervision, there was a change in Metropolitan's lending philosophy which reflected an emphasis on the quantity of loans booked rather than the quality of the loans booked. The bonuses of Mr. Bell and Metropolitan's loan officers were based on loan production. Moreover, due to the rapid growth and emphasis on loan production, Metropolitan's underwriting and loan closing department was understaffed.

39. As previously mentioned, the Nielsen/Venice Inn loan opportunity initially came to Bell via a telephone call from Smith on March 3, 1998. Bell assigned the loan to Thomas, who was responsible for gathering and analyzing information and recommending or rejecting the proposed loan. In addition to Thomas, Sean Keane, who was a new underwriter, assisted Thomas in the evaluation and underwriting of the loan and put together, with the assistance of Thomas, a loan approval request for presentation to Metropolitan's loan committee. The loan approval request required Bell's approval before being submitted to the loan committee.

40. On March 11, 1998, Metropolitan's loan committee conditionally approved the Nielsen/Venice Inn loan of $5.9 million. Several past and present Metropolitan employees testified concerning Metropolitan's processing of the loan. Based on this testimony, it is clear that the loan approval was based on incomplete and inaccurate information, incorrect assumptions, and sloppy underwriting.

41. Once the loan was approved by the loan committee, the loan was moved forward by the closing department, principally Toni Perkins and her supervisor, Rose Yaecker, who became involved at Perkins' request because of Perkins' lack of experience with hotel loans. Timothy Billick, an in-house attorney who also sat on the loan committee, was assigned the responsibility for legal matters and of assuring that the transaction complied with the loan committee's approval.

42. The loan closed without Metropolitan having received complete information and all of the submissions contemplated by the loan approval because of pressure placed upon the loan closing staff to close the transaction and make the loan. Billick, acting as attorney for the Bank, failed to competently represent the Bank's interests or to insure that the conditions of the loan approval were satisfied before the Bank's loan proceeds were disbursed.

43. On November 30, 1998, Metropolitan placed the Nielsen Enterprises/Venice Inn loan in a pool of commercial mortgages owned by it with an aggregate principal balance of approximately $100 million for purposes of a securitization of the mortgage pool. U.S. Bank Trust National Association was named Trustee under a Pooling and Servicing Agreement and holds title to the loans for the benefit of the certificates holder. Metropolitan was named Master Servicer and is the servicing and administrating agent for the pool. Metropolitan also owns 100% of the beneficial certificates issued under the Pooling and Servicing Agreement. As Master Servicer, Metropolitan has brought this suit on behalf of U.S. Bank Trust, as trustee for the pool of mortgage loans.

## THE BASIS OF METROPOLITAN'S LOAN APPROVAL

44. At the time the loan was approved, and as reflected on the executed Request

for Loan Approval, the Metropolitan loan committee understood that Nielsen was purchasing the Venice Inn for approximately $9 million and that Metropolitan was providing a purchase money loan of $5.9 million. The loan committee further understood that part of the financing of the transaction involved a sale-leaseback of the land, which would provide an additional $2 million of the purchase price. The loan committee was under the belief that Nielsen was advancing approximately $1.1 million as cash equity.

45. The loan committee understood that the land only would be owned by the person providing the land advance of $2 million and that there would be a long term unsubordinated lease of the land to Nielsen. The loan committee further understood that its real estate collateral would be a leasehold mortgage on the tenant's interest under the ground lease. The loan committee believed that the tenant would own, and its leasehold mortgage would be secured by, the improvements situated on the land. The loan committee understood that Nielsen, not the Landlord, would own all of the tangible and intangible personal property associated with the hotel and that this personal property would be pledged to the Bank.

46. The primary reason the loan was approved was the expected net operating income of the hotel. Based on pro forma financial statements which Metropolitan had prepared based on information provided by the Vidonis, Metropolitan believed the Venice Inn would generate an annual net operating income of approximately $933,000.

47. Metropolitan knew the loan was risky and charged a 10% per annum interest rate to reflect the risk, of which .5% was earmarked for Compass Capital under the agreement between Metropolitan and Compass Capital. The 10% interest rate compares with the standard commercial interest rate of 8.25 % charged by Metropolitan on less risky loans.

48. Metropolitan assumed the risk associated with the loan because it believed the Venice Inn generated sufficient net operating income to service both Metropolitan's loan and the rent due under the Ground Lease. Metropolitan's assumption about the net operating income available from the operations of the Venice Inn was wrong. The net operating income of $933,000 which the Bank projected was based on the assumption that a Best Western franchise, including the national reservation system, would be in place. Metropolitan did not know that the Venice Inn was about to lose the Best Western franchise and that the Best Western would not permit the franchise to remain in place without an additional capital infusion of approximately $2–2.5 million for renovations and refurbishings. Compass was aware, however, that the Best Western franchise was in jeopardy. During its due diligence, Metropolitan never contacted Best Western to learn the status of the franchise.

49. The loan committee approval was based on numerous assumptions that were incorrect. Among the erroneous assumptions were the following:

(a) Nielsen did not put up $1.1 million in cash equity. Rather, Nielsen put up as equity only $20,000 and received cash at closing of approximately $180,000.

(b) There was to be no seller take back financing, but the Vidonis took back approximately $1.4 million in seller financing.

(c) The Landlord did not purchase the land only for $2 million and instead purchased both land and improvements for $2.5 million. This resulted

in the annual rent being $300,000 rather than $240,000.

(d) Nielsen was to hire a professional hotel manager, but did not.

(e) There were to be no points paid to brokers or the bank. In fact, unknown to Metropolitan, Compass Capital extracted a $750,000 origination fee from the Metropolitan loan proceeds. In addition, American Corporate Real Estate charged a fee of 5% of the real estate advance, or $125,000.[2]

(f) The Best Western franchise was to be in place, in good standing and fully assignable. Instead, the Best Western franchise had been canceled prior to closing and only conditionally reinstated subject to Nielsen submitting a new application for approval. Nielsen lacked the money to make the improvements required by Best Western and the Best Western franchise was lost shortly after closing.

(g) There was to have been a credit report, but one was never obtained. If a credit report had been obtained, it would have revealed that the Nielsens had been in bankruptcy in 1994.

(h) There was to be a loan to value ratio not to exceed 75%. Thomas, however, ordered an appraisal of the fee simple interest rather than the leasehold interest which Nielsen was acquiring and which was securing the Bank's loan. The actual loan to value ratio exceeded what had been approved.

(i) The Venice Inn, without a Best Western franchise, was not capable of generating the $933,000 of net operating income projected by the Bank.

## THE CLOSING OF THE VENICE INN ACQUISITION AND RELATED TRANSACTIONS

50. Closing of the Venice Inn transaction occurred on April 10–13, 1998 in Hagerstown, Maryland. Nielsen was represented by E. Kenneth Grove of the Hagerstown firm of Myers, Young, Grove, & Thomas. The Landlord was represented by Alan Adamson of Ballard, Spahr, Andrews & Ingersoll. The Vidoni entities were represented by Miller, Oliver, Moylan & Stone, a Hagerstown firm. Compass Capital was represented by Paul Walter and David Whitman of Tydings & Rosenberg. Closing was conducted by Chicago Title Insurance Company. Metropolitan's only legal representation was provided by Timothy Billick, the in-house lawyer, who was also a member of the loan committee. Billick was not involved in the transaction until a few days prior to closing. Billick remained in Cleveland at the time of the closing and his involvement was unknown to anyone other than Compass Capital and its attorneys. Only Compass Capital and Chicago Title knew of Metropolitan's involvement as the funder or funding source of the loan. Because Metropolitan's due diligence was passive, the information Metropolitan received about the loan came through the filter of Compass Capital and its attorneys.

51. Prior to the closing, Nielsen created Nielsen Enterprises Md LLC and Nielsen Enterprises LLC. Nielsen Enterprises Md LLC's purpose was to acquire and operate the Venice Inn. Nielsen Enterprises LLC's purpose was to hold the liquor

---

**2.** Metropolitan claims this $750,000 constituted points paid by Nielsen, but Compass Capital claims that this sum represented the profit it made on a loan that was sold to Metropolitan. As noted previously, this dispute was not tried. No matter how this dispute ultimately may be resolved, Metropolitan was operating under the incorrect assumption that Nielsen would have this $750,000 to put into the operation of the hotel.

license that was being acquired and was essential to the operation of the Venice Inn. Unless there is a need to distinguish between the two entities, Nielsen Enterprises Md LLC will be referred to hereafter as Nielsen Enterprises.

52. At the closing, Venice Venture Limited Partnership and Vidoni Limited Partnership, as owners of the real estate, executed a deed to the Landlord of land and improvements for a consideration of $5.9 million. The sellers paid all of the transfer and documentary stamp taxes on this amount, which amounted to $74,340. The business and all of the tangible and intangible personal property and operating assets owned by Venice Motel and Restaurant, Inc. were transferred by Articles of Sale and Transfer recorded at the State Department of Assessments and Taxation to Nielsen Enterprises Md LLC for a consideration of $2.6 million. The liquor license subsequently was transferred pursuant to a proceeding before the Board of License Commissioners for Washington County to Nielsen Enterprises LLC.

53. As part of the closing, the Landlord entered into a Ground Lease Agreement with Nielsen Enterprises Md LLC. Under this Ground Lease, the Landlord leased the land and improvements to Nielsen Enterprises Md LLC. for a term of seven years, with 13 seven year renewal options. Rent was set at $300,000 per year, or $25,000 per month, increasing by 10% every five years. The Ground Lease was net-net, with all expenses and burdens of ownership on the tenant. No personal property had been conveyed to the Landlord, and none was leased by the Landlord to the Tenant pursuant to the Ground Lease.

54. Nielsen Enterprises Md LLC executed a note in the amount of $5.9 million to the order of Compass Capital. This note was guarantied by Nielsen and his wife. The note was secured by a Lease-hold Deed of Trust from Nielsen Enterprises Md LLC in favor of Compass Capital which created a mortgage lien upon the leasehold estate under the Ground Lease. The Note also was secured by a Security Agreement from Nielsen Enterprises Md LLC to Compass Capital creating a security interest under the *Uniform Commercial Code* in all of the existing and after acquired tangible and intangible personal property of Nielsen Enterprises Md. LLC and the proceeds thereof. In addition, Nielsen Enterprises LLC executed a Security Agreement granting an identical security interest in all of its existing and after acquired tangible and intangible personalty and the proceeds thereof, which, in reality, consisted only of the liquor license. Uniform Commercial Code financing statements were filed with the State Department of Assessments and Taxation to perfect the security interests granted in the two Security Agreements. These financing statements comprehensively described the personalty which they covered and provided public notice of the security interests.

55. Compass Capital and Metropolitan entered into a Sale and Warranties Agreement pursuant to which Compass Capital sold to Metropolitan its interest in the Nielsen Enterprises loan. Compass Capital assigned at closing all of its loan documents to Metropolitan, which assignments were placed in the public record by Chicago Title at the same time the other transaction documents were recorded. Only Compass Capital, its attorneys, and Chicago Title knew of the assignment.

56. The Vidonis received a confessed judgment note, guarantied by the Nielsens, for the $1.4 million of seller take-back financing they were providing.

57. Chicago Title was responsible for collecting and disbursing the proceeds of the transaction. The Landlord wired ap-

proximately $2.5 million,[3] and Metropolitan, $5.9 million, to Chicago Title. This was the only hard money in the transaction. No one other than Compass Capital and Chicago Title knew that the $5.9 million provided by Compass Capital was in fact coming from Metropolitan.

58. As part of its disbursements, Chicago Title wired the sum of $3,286,469.76 to First National to satisfy the mortgage lien that bank held on the Venice Inn land and improvements. Satisfaction of this lien was required for the Landlord to obtain unencumbered title to the land and improvements. At least $786,469.76 of the funds wired by Metropolitan to Chicago Title were used to discharge the First National mortgage lien on the Venice Inn real property. If the First National lien had not been released, the Landlord would not have been able to obtain unencumbered title to the land and improvements, and Nielsen's interest in the leasehold and Metropolitan's lien on the leasehold would have been junior to the First National mortgage lien.

**DIFFERENCES BETWEEN THE LOAN CONTEMPLATED BY METROPOLITAN AND THE LOAN THAT CLOSED**

59. There were substantial differences between the loan which Metropolitan's loan committee approved and the loan which actually closed. These differences included the following:

(a) Nielsen did not put up $1.1 million in cash equity. Instead, he deposited only $20,000, which he received back at closing as part of the $181,398 refund from Chicago Title.

(b) Compass Capital took a $750,000 origination fee from the loan proceeds. American Corporate Real Estate also received a $125,000 fee from the proceeds of the loan. Metropolitan did not know of either of these fees.

(c) The Best Western franchise was not in good standing or assignable to Metropolitan and would soon be lost completely.

(d) Nielsen did not engage a professional management company to operate the hotel.

(e) The Vidonis took back a $1.4 million note, which was not secured by any of Metropolitan's collateral. Although no payments were due under the note for 15 months, payments under the note would have been an additional drain on the hotel's cash had Nielsen Enterprises not first defaulted under both the Ground Lease and the leasehold mortgage.

(f) The Landlord obtained title to both land and improvements and leased the property for an annual rent of $300,000. Metropolitan originally understood that the Landlord was obtaining land only, with the improvements being owned by the tenant and part of its collateral, with rent set annually at $240,000. Based on its pre-closing review of the Ground Lease, however, Metropolitan should have known that the Landlord was to obtain title to both land and improvements and that the initial rent was $300,000 per year, as these facts were set out in the documents.

---

**3.** The Landlord actually wired $2.498 million to Chicago Title. The Landlord was required to contribute $2.5 million for the land and improvements it was acquiring and also was responsible for $13,000 in legal fees paid to Ballard Spahr from the closing escrow.

Thus, the Landlord's total required contribution was $2.513 million, but it was entitled to a $15,000 in rent for the remainder of April 1998, thus making its total cash contribution $2.498 million.

## METROPOLITAN WOULD NOT HAVE MADE THE LOAN IF IT KNEW THE TRUE FACTS

60. Had Metropolitan known the true facts and the terms upon which the loan closed, it would not have approved the loan or entered into the transaction. Prior to commencement of this case, Compass Capital and Barry Smith, who also were defendants, filed petitions under the *United States Bankruptcy Code*. For this reason, Metropolitan's claims against them were not litigated in this case and the Court makes no finding as to the culpability of Compass Capital and Smith for Metropolitan's misinformation and erroneous assumptions. Nevertheless, as between the Landlord and Metropolitan, Metropolitan must bear the consequences of poor due diligence, sloppy underwriting, and careless pre-closing review and procedures. The Landlord was in no way responsible for Metropolitan's lapses.

61. Although there were major discrepancies between the loan which closed and the loan Metropolitan believed it was making, many of these discrepancies played no part in and did not cause the eventual default of Nielsen Enterprises. Nor did many of these discrepancies make a difference in the value of the Bank's security interest in the personalty or its lien in the leasehold estate under the Ground Lease. For instance,

(a) Metropolitan was unaware of the Vidoni take back loan, but Nielsen never made any payments to the Vidonis, who confessed judgment only after Nielsen had been declared in default by the Landlord and Metropolitan. Moreover, this seller financing, prior to the defaults, was equivalent to Nielsen having put up $1.1 million in cash equity.

(b) It was essentially irrelevant that the Landlord received land and improvements rather than just land. Metropolitan approved the loan on the strength of the deal as a whole and particularly the anticipated presence of annual net operating income in excess of $900,000. The annual rent of $300,000, compared to the anticipated rent of $240,000, would not have made a significant difference if the anticipated annual net operating income had been realized.

(c) Even if Nielsen had the $750,000 fee taken by Compass Capital, this amount would not have been sufficient to prevent the default or the conditions which caused it.[4]

62. Nielsen Enterprises defaulted because the Venice Inn, at best, breaks even on an annual operating basis, without the payment of any ground rent or any debt service to a lender. There is no annual net operating income generated by the Venice Inn. Unless the Venice Inn receives a creditable national flag with a nationwide reservation system, which will require extensive capital improvements and refurbishing, the Venice Inn will not generate a positive annual net operating income or be able to pay its operating expense, rent under the Ground Lease, and debt service to a lender providing financing to a new owner of the leasehold estate, who would have to make a substantial capital investment.

## THE LANDLORD WAS NOT RESPONSIBLE FOR METROPOLITAN'S MISINFORMATION OR ERRONEOUS ASSUMPTIONS.

63. Metropolitan does not contend that the Landlord misinformed it or supplied it with any incorrect information regarding

---

4. This finding pertains only to this case and does not apply to any subsequent litigation between Metropolitan and Compass Capital and Smith.

the original transaction and the making of its loan.

64. Metropolitan contends that the Landlord reaped a windfall by receiving real estate which cost $5.9 million for an advance of only $2.5 million, making the transaction inequitable because its loan proceeds were used to pay a portion of the $5.9 million cost.

65. The Court disagrees that the Landlord received an inequitable windfall, given that the value of the land and improvements, subject to the Ground Lease, approximately equals the value of the Landlord's interest in the Ground Lease.

66. The capitalization rate for the rental stream under the Ground Lease—12%—is not exorbitant, even accepting the position of the Mr. Kerr, Metropolitan's expert, that a market capitalization rate would have been between 9 and 9.5%. The Landlord's interest in the real estate (which real estate is subject to the Ground Lease) is worth between $2.6 million and $3.3 million, which, when compared to the Landlord's $2.5 million advance, does not constitute unjust enrichment.

67. Metropolitan also contends that the Landlord received a benefit by the use of $786,469.76 of its loan proceeds to discharge the mortgage lien of First National Bank & Trust so that the Landlord could obtain unencumbered title to the real estate. Metropolitan contends that it neither knew of, nor consented to, the use of its loan proceeds for this purpose and would not have consented had it known. Metropolitan contends that the Landlord was unjustly enriched by the sum of $786,469.76 through the unauthorized use of the loan proceeds and that it should be equitably subrogated to the discharged lien of First National in this amount.

68. The Court rejects Metropolitan's position and finds that:

(a) The Landlord was not unjustly enriched by the payment of the First National lien;

(b) All parties to the transaction expected any prior liens from the period of time that the Vidoni family owned the Venice Inn to be discharged;

(c) Had the First National mortgage lien not been released, Nielsen's interest in the leasehold and Metropolitan's lien on the leasehold would have been junior to the First National mortgage lien;

(d) Metropolitan's loan officer, Thomas, was not concerned with how the previous owner had financed the property because the intention was to start over with a new ownership structure with the prior owner's liens having been satisfied; and

(e) Had Metropolitan wished to place restrictions on the use of the loan proceeds, it could have done so. Metropolitan also could have investigated the status of prior liens, but elected not to do so.

## NIELSEN ENTERPRISES IS UNABLE TO MAKE ENDS MEET

69. Nielsen Enterprises operated the Venice Inn from April 14, 1998 to March 10, 1999. During this period of time, Nielsen Enterprises was unable to generate sufficient operating income to operate the hotel, pay the rent under the Ground Lease, and pay the debt service on Metropolitan's loan.

70. The primary problem of the Venice Inn was the lack of the Best Western franchise or an equivalent national flag. For the Venice Inn to obtain a national franchise and its attendant reservation system would require major improvements that would cost between $1 million and $3 million.

71. Neither the Landlord nor Metropolitan, during their respective periods of possession, have been able to operate the hotel profitably (i.e., pay all operating expenses as well as the rent and debt service), despite the presence of professional management companies to operate the hotel.

72. During his tenure, Nielsen lacked the experience, expertise, and financial resources to operate the hotel successfully and on a profitable basis. During his tenure, the service, reputation, and maintenance of the Venice Inn deteriorated. The hotel was understaffed, needing approximately 150 employees, but having only 75 in place.

73. Even if Nielsen had the $750,000 fee taken by Compass Capital available to him, these funds would only have delayed the inevitable.[5]

## NIELSEN DEFAULTS ON THE METROPOLITAN LOAN

74. Nielsen Enterprises failed to make the monthly payments due on the Metropolitan loan on December 1, 1998, and on January 1, February 1, and March 1, 1999. On January 22, 1999, Metropolitan issued a notice of default to Nielsen Enterprises. Another notice of default was sent by Metropolitan's attorneys on February 23, 1999. On March 2, 1999, Metropolitan declared the default and demanded payment of the loan by letter from Metropolitan's attorneys.

75. On February 6, 1999, Lloyd Bell visited Nielsen at the Venice Inn to discuss the situation with Nielsen and inspect the property. After this meeting, Metropolitan had no reasonable hope or expectation that Nielsen Enterprises would make any additional payments under the Metropolitan loan or the Ground Lease.

## NIELSEN ENTERPRISES DEFAULTS UNDER THE GROUND LEASE.

76. On February 1, 1999, Nielsen Enterprises failed to make a $25,000 payment of monthly rent under the Ground Lease.

77. The Ground Lease is ambiguous as to when payments are due during the first lease year. This ambiguity results from a tension between Sections 1.5 ( basic rent), 1.9 (term) and 3.2 (payment of basic rent). The tension stems from the phrase "following the first (1st) Lease Year" in Section 3.2. This phrase was in a form lease borrowed from a prior unrelated transaction and inadvertently was never removed from any of the drafts or final version of the document.

78. Both the Landlord and Nielsen believed that monthly rent was payable in advance and, up to the date of the default, Nielsen actually paid rent in advance. Based on the parol evidence and the manifest intent of the Ground Lease, the Court concludes that rent is payable in advance on the first day of each month during the first lease year. Hence, a payment of rent was due on February 1, 1999.

79. On February 17, 1999, the Landlord issued a notice of default to Nielsen Enterprises, with a copy to Metropolitan, based on the failure to make the February 1, 1999 payment. These notices were sent by facsimile and certified mail. The faxed copies of the default notice were received on February 17, 1999, and the certified mail copies on February 22, 1999.

80. On March 2, 1999, the Landlord issued an additional default notice which specified that March 9, 1999 was the last day for a cure of the default in making the February 1, 1999, payment. This additional notice was sent to and received by Nielsen Enterprises and Metropolitan on

---

**5.** This finding is made solely for purposes of this case and not any subsequent litigation between Metropolitan and Compass Capital and Smith.

March 2, 1999. The Court finds that March 9, 1999, was the last day of the cure period under the terms of the Ground Lease.

81. Metropolitan knew that Nielsen Enterprises had not made the February 1, 1999, rent payment and that March 9, 1999, was the last day of the cure period under the Ground Lease.

82. Metropolitan knew that it, as leasehold mortgagee, was not entitled to a separate cure period beyond that afforded to the tenant. Thus, Metropolitan appreciated that the Ground Lease might be terminated if it did not make the $25,000 cure payment for the February 1, 1999, installment by March 9, 1999.

83. Metropolitan had no reasonable hope or expectation that Nielsen Enterprises would make the cure payment. Metropolitan intended at all times to make the cure payment, but failed to make the cure payment by the end of the cure period due to mistake and inadvertence in its loan administration.

84. On March 10, 1999, Metropolitan sent by overnight delivery a $50,000 check to the Landlord in payment of delinquent rent for the months of February and March. This check was received by the Landlord on March 11, 1999.

85. Because the cure payment was not received until March 11, 1999, the Landlord had the right pursuant to the literal provisions of the Ground Lease to declare the Ground Lease terminated. Metropolitan, however, as leasehold mortgagee and assignee of the Ground Lease, was entitled to redeem the Ground Lease from termination through the exercise of the statutory right of redemption afforded tenants under Maryland law. Under Section 8–401(e) of the *Real Property Article, Annotated Code of Maryland,* a tenant may redeem its leasehold by bringing the rent current at any time before being evicted by order of the Maryland District Court.

## THE LANDLORD'S CONTRACT WITH NIELSEN

86. On March 2, 1999, Kenneth Shapiro contacted Lawrence Conn, a Maryland real estate attorney, regarding representing the Landlord. At first, the Landlord sought advice concerning its rights against Nielsen Enterprises, as the defaulting tenant under the Ground Lease. The Landlord soon came to appreciate that it might be able to terminate the Ground Lease and obtain full ownership of the Venice Inn real estate (with an appraised value in 1998 of approximately $8.6 million, for an advance of only $2.5 million).

87. Recognizing that litigation might be imminent, Conn requested the assistance of Robert Carson, a litigation attorney affiliated with his law firm.

88. By March 4, 1999, however, Conn and Carson became aware that the Landlord's strategy had changed and the Landlord wanted to recapture the property free of the Ground Lease and Metropolitan's leasehold mortgage.

89. On March 3 or 4, 1999, Andrew Shapiro contacted Nielsen to open negotiations for Nielsen to quit the property without a struggle. Between March 3 and 9, 1999, Shapiro and Nielsen had reached an agreement and Conn had drafted two documents to embody the agreement they had reached.

90. The first agreement (Exhibit 133), dated March 9, 1999, between the Landlord and Nielsen Enterprises Md LLC and Nielsen Enterprises LLC was signed on behalf of the Landlord on March 9, 1999 and by the Nielsen entities on March 10, 1999. It basically provides four things:

 (a) the Ground Lease would terminate for failure to pay rent on March 9, 1999;

 (b) Nielsen Enterprises Md LLC would vacate the Venice Inn on or before

March 9, 1999, and agree to deliver to the Landlord possession of the Venice Inn (including all tangible and intangible personal property) so that Landlord might engage a new operator of the property;

(c) Nielsen Enterprises LLC would assign to the Landlord its liquor license; and

(d) Nielsen Enterprises Md LLC, as tenant, would waive right to redeem under Section 8–401(e) of the *Real Property Article.*

This agreement provides for a payment of $50,000 to Nielsen Enterprises Md LLC.

91. Carson and Conn advised Andrew Shapiro that it was unclear whether and under what circumstances a tenant could waive the statutory right of redemption and that the answer might be dependant upon the views of the particular judge deciding the issue.

92. Neither Conn nor Carson advised the Landlord that the strategy the Landlord was pursuing was illegal, although they did advise the Landlord that the strategy had only a 50/50 chance of success.

93. A second agreement (Exhibit 134), dated March 9, 1999, between the Landlord and Nielsen Properties, Inc., an Illinois corporation owned by Nielsen in which he held title to his real estate investments, was signed on behalf of the Landlord on March 9, 1999, and on behalf of Nielsen Properties on March 10, 1999. This agreement called for Nielsen to provide real estate services to the Landlord in Illinois in consideration for a payment of $200,000. The payment split between the first and second agreements was a sham. In actuality, the Landlord was paying Nielsen Enterprises Md LLC $250,000 to vacate the Venice Inn peacefully, surrender the personal property, cause Nielsen Enterprises LLC to assign the liquor license, and waive the statutory right of redemption. Nielsen was concerned that any payments to Nielsen Enterprises or to him would be subject to Metropolitan's claim under its loan documents, including his guaranty. The Landlord never intended that Nielsen Properties would provide any real estate consulting services to the Landlord in Illinois, and Nielsen Properties never did so.

94. In actuality, the Landlord only paid $50,000 of the promised $250,000 to Nielsen. The Landlord made these payments in installments pursuant to what was ostensibly an escrow arrangement set up by Landlord and Guaranteed Title. At the direction of Landlord, Guaranteed Title was to issue checks payable to Nielsen Properties. A dispute looms between Nielsen and the Landlord as to whether the Landlord is obligated to pay the remaining $200,000. A second dispute looms as to Metropolitan's entitlement pursuant to its Security Agreements to the $250,000 which the Landlord agreed to pay Nielsen Enterprise Md LLC. The Court makes no determination in this proceeding as to the merit of this claim, nor as to any defense which the Landlord may offer in response to the claim. These issues will be settled in a separate proceeding brought by Nielsen against the Landlord. *Nielsen Enterprises, et al. v. Venice MD, LLC, et al.,* L–02–3195. Metropolitan will be allowed to intervene in that proceeding.

### THE LANDLORD DID NOT ACT FRAUDULENTLY TOWARDS THE BANK.

95. The Court finds that the Landlord did not commit fraud in pursuit of its strategy to obtain ownership of the Venice Inn free of the Ground Lease. The Landlord gave all notices that were required by the Ground Lease. Metropolitan had no reasonable hope or expectation that Nielsen Enterprises would cure the payment default by March 9. The Landlord did not induce Nielsen Enterprises not to make

the cure payment. Nielsen Enterprises simply had no money with which to pay what was due. Finally, Mr. Conn and Mr. Carson advised the Landlord that it was not improper for a landlord to pay a tenant to voluntarily surrender the leasehold estate after a default.

96. The Landlord's strategy to obtain ownership of the Venice Inn free of the Ground Lease fell within a moral gray area, but was not fraudulent. It would have been honorable for Nielsen to have advised Metropolitan of the Landlord's offer to buy his cooperation. But, Nielsen was not required to do so. He had an interest in the Venice Inn and he was entitled to accept a payment in exchange for relinquishing that interest and vacating peaceably.

It was a "sharp practice" for the Landlord to hope that Metropolitan would fail to make a timely cure payment. The Landlord knew that it would be reaping a potential windfall if the Bank remained "asleep at the switch." But, the Landlord gave all of the required notices, and the Bank's inattention was not induced by any misrepresentation or omission on the Landlord's part.

The most offensive part of the Landlord's plan was to mislabel the majority of the payments as compensation for real estate services. But, so long as the payments themselves were not illegal, the mischaracterization does not make the entire plan fraudulent. For example, if a homeowner agrees to pay a painter in cash to aid the painter in evading taxes, the homeowner may have committed a crime, but the contract to paint the house would nevertheless be legal.

### THE LANDLORD ASSUMES CONTROL OVER THE VENICE INN

97. On March 10, 1999, the Landlord took physical possession of the Venice Inn, both real estate and personal property, from Nielsen Enterprises and commenced operating the hotel.

98. On March 11, 1999, the Landlord, after receiving Metropolitan's $50,000 check, returned the attempted cure payment and advised Metropolitan that the Landlord had terminated the Ground Lease and taken control of the Venice Inn.

99. Initially, the Landlord retained Lodging Unlimited to manage the hotel. Lodging Unlimited was replaced in June 1999 by Prime Hospitality. Both companies provided competent, professional management while operating the Venice Inn.

100. The Landlord operated the Venice Inn from March 10, 1999, until October 1, 1999, when possession was turned over to Metropolitan. During this period, and despite the presence of professional management, the Venice Inn either barely broke even or lost money on an operating basis without the payment of any monthly rent to the Landlord or any loan payments to Metropolitan.

101. During the time the Venice Inn was in the Landlord's possession, the Landlord made no material capital improvements to the Venice Inn.

102. The lack of a national franchise and reservation system was a principal cause of the break even operational performance. A national franchise could not be obtained, however, without the expenditure of $1 million to $3 million in renovations, an amount the Landlord was not prepared to expend while Metropolitan claimed an interest in the hotel.

103. There may be other reasons for the poor financial performance of the Venice Inn under the Landlord's control, but this subject was not litigated and the Court makes no finding in this regard.

## THE LANDLORD'S TAKEOVER OF THE VENICE INN WAS WRONGFUL

104. The Landlord's attempt to terminate the Ground Lease was unsuccessful. Under Section 8–401(e) of the *Real Property Article*, the tenant under the Ground Lease had the right to redeem the leasehold estate even after March 9, 1999. This right to redeem continued until such time as the Constable of the Maryland District Court served an eviction order of that Court.

105. Pursuant to the Leasehold Deed of Trust, Nielsen Enterprises conveyed and assigned to the Bank all of its rights as tenant under the Ground Lease. Both the Ground Lease and the Leasehold Deed of Trust expressly recognized the Bank's interest in the Ground Lease and provided that the tenant could not terminate, surrender, or alter the Ground Lease without the Bank's approval. A tenant's right to redeem under Section 8–401(e) of the *Real Property Article* was among the bundle of rights that Nielsen Enterprises conveyed and assigned to the Bank pursuant to the Leasehold Deed of Trust. Accordingly, Nielsen Enterprises could not relinquish or waive the right to redeem. Concomitantly, the Bank had the right to redeem, which it exercised. The payment sent by Metropolitan on March 10, 1999 and received by the Landlord on March 11, 1999 was timely, and its receipt effectively cured the payment default under the Ground Lease.

106. Because the payment made on March 11 by Metropolitan cured the payment default, the Landlord's takeover of the Venice Inn on March 10, 1999, was wrongful.

107. By taking control of the Venice Inn on March 10, which the Bank's subsequently protested, the Landlord breached the covenant of quiet enjoyment of the Ground Lease, which permitted Metropolitan, in the exercise of its rights as leasehold mortgagee, to exercise dominion and control over the leasehold estate upon its borrower's default without interference from the Landlord. The Landlord also breached the third party beneficiary provisions of Article 14 of the Ground Lease, which prohibited the Landlord from agreeing to a termination of the Ground Lease or accepting a surrender of the leasehold estate by the tenant.

108. By obtaining the execution and performance of the two March 9 Agreements (Exhibits 133 and 134), the Landlord tortiously interfered with Metropolitan's contract with Nielsen Enterprises Md LLC and Nielsen Enterprises LLC contained in the Leasehold Deed of Trust and in the two Security Agreements.

109. Nielsen Enterprises Md LLC and Nielsen Enterprises LLC transferred all of the tangible and intangible personal property of the Venice Inn to the Landlord pursuant to the two March 9 agreements without the consent of Metropolitan.

110. As a result of its having declared a default, Metropolitan was entitled to immediate possession of all of the personal property of the Venice Inn. Metropolitan was entitled to collect directly all of the accounts receivable and obligations owed by third parties to Nielsen Enterprises. By taking possession and control of the tangible and intangible personal property of the Venice Inn, the Landlord converted Metropolitan's personal property collateral. When the Landlord turned over possession of the personal property on October 1, 1999, the Landlord's initial act of conversion became a trespass as to the furniture, fixtures, and equipment.

111. During the time that the Landlord took control of the Venice Inn, Defendant Andrew Shapiro was the managing member in charge of the Landlord's day-to-day operation.

112. While under the Landlord's control, the Venice Inn had only one operating account, from which all bills and expenses of the hotel were paid. The funds in this operating account came from the revenues and receipts of the Venice Inn. The Landlord, acting through the management company, paid bills and expenses of unsecured creditors of Nielsen Enterprises attributable to the period prior to as well as the period after the Landlord's takeover. The Landlord also paid from the operating account the invoices of Conn and Carson for their assistance in the takeover. Because Metropolitan objected to the takeover, these payments were made without Metropolitan's consent.

113. All funds placed in the operating account during the period of the Landlord's operation of the Venice Inn came from or were attributable to Metropolitan's collateral.

114. During its possession of the Venice Inn, the Landlord used the furniture, fixtures, and equipment which were part of Metropolitan's collateral.

115. During its possession, the Landlord used a temporary liquor license and paid to the State $70,000 in sales and use tax incurred by and unpaid by Nielsen. The Liquor Board gave the Landlord a temporary license because the Landlord was operating the Venice Inn as the successor in interest to Nielsen.

116. The gross revenues of the Venice Inn from March 10, 1999 to September 30, 1999 amounted to $1,167,288. With some exceptions, these revenues were used to pay operating expenses. The Landlord did not realize any profit from its operation of the Venice Inn. To the contrary, according to Metropolitan's accounting expert, Andrew Lombardo, the Venice Inn lost $132,999 during the period in which the Landlord was in possession. Prejudgement interest on the amount of the gross revenues, accruing from October 1, 1999 through February 1, 2002 would amount to $163,867.68, with per day interest thereafter at the rate of $191.88.

117. Much of the personal property of the Venice Inn was at or near the end of its useful life. The condition of the personal property at the time the Landlord turned over possession to Metropolitan was the same as the condition at the time the Landlord took possession. Any diminution in value was nominal.

118. S. Brent Lynch, Plaintiff's expert, testified that the fair rental value of the furniture, fixtures, and equipment would be $62,205.97 per month based on new but equivalent replacement items. The value would be $19,937.68 based on the then existing (mostly used) furniture, fixtures, and equipment. Mr. Lynch's valuation was based on the full value of the equipment being financed for a short-term (12 months) at an interest rate (11.5%), a rate equal to 1999 market interest rates. Moreover, under Mr. Lynch's analysis, the "lessee" would own the equipment at the conclusion of 12 months. Mr. Lynch also testified that obtaining new replacement furniture, fixtures, and equipment would take between three to five months and that there was no place in the market from which an entire hotel's worth of used furniture, fixtures, and equipment could be obtained. The Landlord was in possession of the Venice Inn for a total of 6 months and 22 days, or 6.71 months.

119. The Landlord's expert with respect to the value of the personal property, Richard E. Lowry, testified that the removed fair market value of the personal property as of March 10, 1999 was $164,500. Mr. Lowry testified that the in-place fair market value would be $10,000 to $15,000 greater, or approximately $174,500 to $179,500.

## THE LIQUOR LICENSE

120. The Landlord paid $70,000 in sales and use taxes to the State of Maryland owed by Nielsen Enterprises in connection with the Landlord's efforts to have the liquor license transferred to it. This payment was made from the $250,000 that the Landlord placed in escrow with Guaranteed Title as part of the side deal with Nielsen Enterprises. The Landlord made this expenditure because the Board of License Commissioners for Washington County would not authorize the transfer of the license to the Landlord if these taxes were not first paid. Had the payment not been made, the liquor license might have terminated.

121. Nevertheless, the State of Maryland had not filed a lien for these sales and use taxes. There was no evidence that any such lien, even had it been filed, would have predated Metropolitan's security interest or had any priority over Metropolitan's security interest in the liquor license. Accordingly, the Court finds that no lien in favor of the State of Maryland existed as to the liquor license and that the liquor license was subject to Metropolitan's prior perfect security interest.

122. Metropolitan contends that it would have been able to have the liquor license transferred pursuant to its security interest without the payment of the delinquent sales and uses taxes of Nielsen Enterprises. If Metropolitan is correct, then the Landlord would not be entitled to any offset for this $70,000 expenditure.

## METROPOLITAN BEGINS OPERATING THE VENICE INN

123. Pursuant to an agreement that preserved the litigation positions of both parties, the Landlord surrendered the Venice Inn to Metropolitan on October 1, 1999.

124. The Bank paid the rent due under the Ground Lease for the period of March 10 through September 30, 1999, a total of 6.71 months, together with the real property taxes and insurance attributable to this period. This sum amounted to $167,750 for rent, $11,078.52 for insurance, and $41,221.96 for taxes. Prejudgement interest on this amount from October 1, 1999 through to February 1, 2002 at 6% per annum would be $30,891.14, with per day interest thereafter accruing at $36.17.

125. After receiving possession of the Venice Inn from the Landlord on October 1, 1999, Metropolitan obtained the appointment of a receiver from the Circuit Court for Washington County pursuant to a foreclosure proceeding Metropolitan had instituted in that Court. The hotel operated under the auspices of the receiver until Metropolitan concluded a foreclosure sale of the leasehold estate under the Ground Lease and the tangible and intangible personal property subject to the security interest. The real and personal property was bid in by Metropolitan and title was taken in a newly created title holding entity, Venice Inn LLC, which is the present title holder.

126. The Bank initially retained Prime Hospitality to continue managing the hotel, but replaced Prime Hospitality in mid-November, 1999 with Horizon Hotels, which now manages the Venice Inn.

127. During the Bank's tenure, the Venice Inn has broken even on an operating basis, but the hotel does not generate enough cash to pay either the Ground Lease or any hypothetical debt service.

128. The Bank has been unsuccessful in its efforts to sell the Venice Inn, subject to the Ground Lease. David Slezak, Metropolitan's General counsel and a senior vice president, testified that the hotel needs a national franchise, such as Best Western, to be profitable. Franchisers,

however, require capital improvements $1–3.5 million, which the Bank contends it is reluctant to advance due to the existence of the Ground Lease. Mr. Slezak also said that the $300,000 annual rent under the Ground Lease, based on a 12% return, is an impediment to a sale in the current low interest rate environment. The Landlord contends, however, that the greatest impediment to a sale is that the property does not generate a positive cash flow, and does not generate income with which to pay rent or debt service. Another impediment to sale is the Landlord's ownership of, and ability to depreciate for tax purposes, the improvements. The Landlord would be entitled to depreciate any new improvement made to secure a national franchise, Slezak opined.

129. Mr. Slezak also testified that, although Metropolitan has paid monthly rent to the Landlord, it has not, in his view, entered into a new lease with the Landlord and never became a party to the existing Ground Lease.

130. Metropolitan claims it has had no serious offers on the Venice Inn for over $1 million. Although a group bid $2.4 million at the foreclosure sale, Metropolitan claims that this was not a bona fide offer. There is little prospect for a new purchaser of the Venice Inn willing to make the capital improvements needed to obtain a national franchise unless there is a complete restructuring of the financial underpinnings of the hotel. This restructuring would have to include the amount of the Landlord's advance reflected by the Ground Lease

### ATTORNEYS' FEES

131. Metropolitan was the prevailing party in its dispute with the Landlord over who had the right to possess the Venice Inn following Nielsen's default. The Court has determined that Metropolitan, rather than the Landlord, was entitled to

operate the Venice Inn. Metropolitan contends that, as the prevailing party, it is entitled to attorney's fees under Section 13.15 of the Ground Lease. The Landlord disagrees, arguing that Metropolitan was never a party to the Ground Lease and that Metropolitan's status as a third party beneficiary did not entitle it to impose the attorney's fee provision. In the alternative, the Landlord presses for the attorney's fees it incurred in defending the portions of the suit on which it prevailed.

## III. CONCLUSIONS OF LAW

### A. Equitable Subrogation

■ When the Landlord agreed to purchase the Venice Inn from the Vidoni family, the property was subject to a mortgage of $3,286,469.76. The mortgage was held by First National Bank and Trust Company. At the closing, a portion of the funds advanced by Metropolitan was used to pay off the mortgage.

Metropolitan urges the Court to subrogate it to the First National mortgage. If allowed, Metropolitan would hold a first-priority lien on the Venice Inn property in the amount of $786,469.76, which is the difference between the $2.5 million advanced by the Landlord and the balance of the mortgage satisfied by the loan proceeds.

In support of its claim, Metropolitan argues that the Landlord, in exchange for $2.5 million, received property with a total purchase price of $5.9 million. To avoid this windfall, which came to pass through money advanced by Metropolitan, the lender contends that it should recover loan monies which benefitted the Landlord.

The Court rejects this argument. The Landlord did not reap a windfall. According to the experts, the property's value was determined by the income stream. As Mr. Thomas of Metropolitan testified, the Bank was lending against the net income,

which was overestimated because of erroneous assumptions regarding the Best Western franchise. As previously stated, the actual income stream was worth between $2.681 and $3.3 million. (Findings of Fact at ¶ 37.) Furthermore, it was within the contemplation of all the parties that the Landlord would receive a fee simple in the property and then re-lease it to Nielsen for a term of up to 98 years. All parties to the transaction understood that the First National mortgage was to be extinguished.

Therefore, there is no reasonable basis for the Court to exercise its equitable powers and subrogate Metropolitan to the First National mortgage.

**B. Recharacterization of the Mortgage as a Loan**

■ Metropolitan's goal is to obtain fee simple ownership of the realty and personalty that comprise the Venice Inn. Thus packaged, the property would be more attractive to potential purchasers. Metropolitan could sell the property and rid itself of this difficult loan. As it stands, Metropolitan cannot realize this goal because (i) the real estate is owned by the Landlord and (ii) there is no provision in the Ground Lease giving the tenant the right to prepay and purchase the property.

Metropolitan argues that the Landlord–Nielsen transaction was, in reality, a loan (with security). The Court has the equita-

ble power, Metropolitan contends, to recharacterize the lease as a mortgage in order to remedy an overriding inequity.[6] Under Maryland law, Metropolitan would have the right to prepay the mortgage, thereby wiping out the encumbrance.

The Court declines to recharacterize the Ground Lease for several reasons. The Landlord has not received a windfall. As discussed previously, the discrepancy between the value of the land conveyed to the Landlord and the Landlord's consideration is too small to be considered unfair or unjust. Also, this was a transaction among sophisticated parties, which reduces the likelihood of surprise or mistake. Like many real estate deals, the transaction at issue has characteristics of both a land sale and a loan. There is ample evidence, however, that the transaction was a true sale to the Landlord and not just a security device. For example, the Landlord granted Nielsen a 98–year term precisely because a 99–year term, under Maryland law, would make the lease redeemable. See Md.Code Ann., Real Prop. § 8–110 (Michie 1996). Moreover, the absence of a right to prepay is evident from a review of the papers. Metropolitan had full access to the transaction documents prior to the closing and raised no objection. Finally, the Landlord did not cause Metropolitan's financial predicament. Rather, Metropolitan's failure to perform proper due diligence and its haphazard acceptance of income predictions are to blame.[7]

6. Metropolitan originally based its recharacterization argument upon § 7–101(a) of the Real Property Article of the Maryland code. In order to recharacterize under this statute, the Bank would have to establish, by clear and convincing evidence, that the parties intended the lease to be a mortgage. Additionally, the purpose behind this statute was to protect unsophisticated grantors from unscrupulous grantees. Metropolitan is not, therefore, within the intended class of beneficiaries. During oral argument, the Bank apparently abandoned this statutory basis for

recharacterization and relied instead on notions of unjust enrichment. The inequity argument, therefore, is a fall-back position.

7. In addition, there are practical difficulties posed by an equitable recharacterization of the mortgage. For example, many commercial mortgages have prepayment penalties. To recharacterize the lease and allow the Bank to redeem it without paying a penalty would be to impose upon the Landlord a loan with commercially unreasonable terms. The

Metropolitan argues that equitable re-characterization in this case is supported by *Gaither v. Clark,* 67 Md. 18, 8 A. 740 (1887). This 19th century case is readily distinguishable, however. In *Gaither,* the transaction originally proposed was a loan. The lender wanted to charge 12% interest, which would have violated the then-existing usury limit of 6%. To skirt this law, the parties settled upon a redeemable lease structure with a rent equivalent to 12% annual interest. The *Gaither* Court re-characterized the lease as a mortgage when the widow of the lessee attempted to redeem it. In the instant case, the parties intended a lease from the beginning. Furthermore, there is nothing illegal about the transaction. Finally, *Gaither* and the other cases relied on by the Bank involved disputes between borrowers (transferors) and lenders (transferees). This situation is different because a non-signatory is attempting to alter the terms of an agreement to which it was not a direct party.

In short, there is no reason for equity to intervene and recharacterize the lease as a mortgage.

## C. Interference with a Contract

■ The Landlord tortiously interfered with Metropolitan's contracts contained in the Leasehold Deed of Trust and in the two Security Agreements. (*See* Findings of Fact at ¶ 108.) Because this interference effectively disposed of a security interest, it can also be viewed as interference with a security agreement. Metropolitan contends, therefore, that the proper measure of damages is found under the U.C.C. This argument is addressed below.

Bank has not explained how this problem and others like it could be resolved.

8. Indeed, the evidence is that the Landlord employed a competent, professional manage-

## D. The Measure of Damages due Metropolitan

Metropolitan argues that the appropriate measure of damages is (i) the gross revenues of the Venice Inn, and (ii) the rent, taxes, and insurance Metropolitan paid under protest to the Landlord when it quit the premises. The Landlord counters that the correct measure of damages is compensatory. Because it lost money during its operation of the hotel, the Bank should recover nothing, the Landlord argues. The Court will address these damages arguments in turn.

## 1. Metropolitan's Right to Receive the Gross Revenues of the Venice Inn

■ Metropolitan argues that all revenues received by the Venice Inn during the Landlord's management were cash proceeds of Metropolitan's secured collateral. Metropolitan does not argue that the Landlord mismanaged, skimmed profits, or squandered income from the Venice Inn.[8] Rather, the Bank points to the Maryland U.C.C., which provides that a security interest continues in the identifiable proceeds obtained from the sale, exchange, or other disposition of secured collateral. *See* Md.Code Ann., Com. Law § 9–306(2) (Michie 1997). The Bank argues that the use of its secured personal property was a disposition and that it is entitled to all proceeds therefrom. In support, Metropolitan principally relies upon two cases from other states with identical versions of the U.C.C. *See Pavilion Hotel, Inc. v. Valley Nat'l. Bank,* 180 Ariz. 498, 885 P.2d 186 (Ariz.App.1994); *United States v. PS Hotel Corp.,* 404 F.Supp. 1188 (E.D.Mo.

ment company. Further, when Metropolitan assumed control, it employed an equivalent management company and the Bank, too, lost money while operating the hotel. (Findings of Fact at ¶¶ 99, 100.)

1975). Additionally, the Bank argues that the Landlord violated § 9–201 of the Maryland U.C.C. when it used these cash proceeds to pay unsecured creditors in order to continue operating the Venice Inn.

The Court disagrees with Metropolitan's analysis. Neither case cited by Metropolitan supports its position. In *PS Hotel,* the court held that accounts receivable generated *prior* to the eviction were secured collateral, and that the subsequent reinvestment of these monies created proceeds under § 9–306. *United States v. PS Hotel Corp.,* 404 F.Supp. 1188 (E.D.Mo.1975). Similarly, in *Pavilion Hotel,* the court found that bank accounts containing hotel revenues held proceeds only to the extent that the funds represented post-bankruptcy-petition payment of *pre-petition* accounts receivable. *Pavilion Hotel, Inc. v. Valley Nat'l Bank,* 180 Ariz. 498, 885 P.2d 186 (Ariz.App.1994). The instant case is different because Metropolitan claims entitlement to *post-eviction* accounts receivable, which are monies earned after the Landlord took possession.

In addition, the post-eviction use of the Hotel's furnishings and other personalty does not constitute a disposition of collateral which generates proceeds. *Matter of Value–Added Communications, Inc.,* 139 F.3d 543, 546 (5th Cir.1998). Revenues are treated as proceeds only if there is "some permanent disposition of the property, more than the mere use of property to provide hospitality to guests." *In re Corpus Christi Hotel Partners, Ltd.,* 133 B.R. 850, 855 (Bkrtcy.S.D.Tex.1991); *see also In re Cleary Bros. Construction Co.,* 9 B.R. 40 (Bkrtcy.S.D.Fla.1980) (rents paid for the use of construction equipment did not constitute proceeds within the meaning of U.C.C. § 9–306). Accordingly, Metro-

politan has not advanced a valid legal basis to support an award of gross revenues.

There is a more fundamental problem with Metropolitan's argument: had the Landlord not used the revenues to keep the hotel running, the proceeds would have stopped abruptly. Moreover, the Landlord lost approximately $130,000 during its operation of the Venice Inn. (Findings of Fact at ¶ 116.) Metropolitan was, therefore, better off having the Landlord absorb these losses. Accordingly, the Court denies Metropolitan's request for gross revenues earned during the Landlord's operation of the Venice Inn.

**2. The Rent, Taxes, and Insurance Paid by Metropolitan to the Landlord**

■ Metropolitan argues that the rent, taxes, and insurance paid to the Landlord when it surrendered the Hotel on October 1, 1999, should be returned to the Bank. The Court agrees. These payments were for benefits which the Bank did not enjoy (i.e., the right of possession). Accordingly, the Court will delineate, by separate order, the amount due, as well as accrued prejudgment interest.

**3. The Rental Value of Metropolitan's Secured Property**

■ As previously stated, Metropolitan had a perfected security interest in the furnishings, fixtures, and equipment of the Venice Inn. This property was returned intact when the Venice Inn was surrendered to the Bank on October 1st.[9] The appropriate measure of damages for this trespass is the fair rental value of these items. The Bank's expert testified that the fair rental value of the then-existing furnishings, fixtures, and equipment was

9. Certain items, such as food and alcohol, were consumed during the Landlord's wrongful occupation. These items were replaced in the normal course of business, however, and the Bank suffered no loss from their consumption.

$19,937.68 per month, and the fair rental value of new items was $62,205.97 per month. Both sides agree that the Court has discretion in choosing a figure within this range.

The Court assigns a rental value of $25,000 per month. This figure, when multiplied by the number of months that the Landlord wrongfully occupied the Venice Inn, approaches the fair market sale value for this furniture, most of which was well worn. Nevertheless, the Court concludes that the Landlord should be charged a premium. There was no vender from which the Landlord could have obtained an entire hotel's worth of used furnishings. It would have taken the Landlord between three and five months to obtain new replacements. (Findings of Fact at ¶ 118). Finally, the rental was forced upon Metropolitan, which vigorously disputed the Landlord's takeover of the hotel.

### E. The Bank's Right to the Money Paid to Nielsen Under the March 9th Agreements

The Bank claims that money paid and promised to Nielsen by the Landlord is subject to both of its security agreements. This issue was not litigated. Moreover, it has not been determined whether Nielsen can enforce his March 9, 1999 contracts with the Landlord. This is the subject of a separate suit, *Nielsen Enterprises, et al. v. Venice MD, et al.*, L–02–3195, into which Metropolitan will be permitted to intervene.

### F. The Landlord's Right to Offset the Liquor License

■ The Landlord has counter-claimed for $70,000 of back taxes that it paid in order to transfer the liquor license from Nielsen to it. To effect a transfer, all outstanding sales and use taxes must be paid. Md. Ann.Code, Art. 2B, § 10–503(a)(2)(ii) (2002). Because Metropolitan

(or its designee) now holds the license, the Landlord claims an offset in this amount.

The Court disagrees. The Landlord paid this sum as a volunteer, rather than at the request of Metropolitan. Additionally, Metropolitan has a sound argument that its perfected security interest in the liquor license enjoys a higher priority than the State's lien for unpaid taxes. Thus, it is debatable whether the State could have required Metropolitan to pay any or all back taxes. Accordingly, the Landlord's counter-claim is denied.

### G. Attorneys' Fees Under the Ground Lease

■ Section 13.15 of the Ground Lease provides that the prevailing party in a dispute over the Ground Lease is entitled to attorneys' fees. Because Metropolitan is a third party beneficiary of the Ground Lease, the Bank contends that it is entitled to the benefit of this provision.

This argument must fail. Metropolitan was never a "party" as defined in the Ground Lease. In order to be characterized as a party, Metropolitan would be required to assume the burdens of the Ground Lease, as well as the benefits. The most significant of these obligations would be the burden of paying rent. Metropolitan does not suggest that it is obligated to pay rent, or that it would be subject to any of the liquidated damages provisions for non-payment. Accordingly, Metropolitan is not a full party to the Ground lease and cannot enforce the attorneys' fees provision. Neither can this provision be enforced against Metropolitan.

### H. Punitive Damages

■ Under Maryland law, punitive damages can be awarded only if actual malice is present. *Ellerin v. Fairfax Savs., F.S.B.*, 337 Md. 216, 229, 652 A.2d 1117 (1995). In this case, there is insuffi-

cient evidence that the Landlord acted with actual malice. The Landlord sought the advice of competent Maryland counsel, who advised it that its strategy, while risky, was legal. (Findings of Fact at ¶ 92). The Landlord's actions were also motivated by a desire to benefit itself, but not by a desire to wantonly inflict damages upon Metropolitan. Accordingly, punitive damages are inappropriate.

## I. Andrew Shapiro's Personal Liability

█ Metropolitan seeks judgment against Andrew Shapiro, individually. This is a relatively close question. Mr. Shapiro was, in fact, the prime mover for the Landlord. Nevertheless, it is clear that he always acted in his capacity as an agent of Venice MD, LLC. Mr. Shapiro acted in this capacity with the full knowledge and approval of the company. Accordingly, it is appropriate to saddle the company with liability, but not Mr. Shapiro.

## IV. CONCLUSION

For the reasons stated herein, the Court shall, by separate order, ENTER JUDGMENT as follows: (i) for the Plaintiff on Counts V, IX, X, XI, and XII of the Second Amended Complaint, (ii) for the Plaintiff on the Amended Counter–Complaint, and (iii) for the Defendants on Counts III, IV, VI, VII, and XIII of the Amended Counter–Complaint. The Clerk will be DIRECTED the Clerk to CLOSE the CASE.

### ORDER

On January 14, 2002, the Court began a nine day bench trial. There are nine Counts in the Second Amended Complaint and a single issue in the Amended Counter–Claim which are still viable. For the reasons outlined in the Memorandum Opinion of even date, this Court hereby ENTERS JUDGMENT as follows:

A. *For the Plaintiff*

(i) under Count V, a declaratory judgment that the attempted forfeiture of the Venice Inn was invalid;

(ii) under Count IX (conversion), against Defendants Venice MD, LLC, and Hagerstown Maryland, LLC, jointly and severally, in the amount of $167,750.00;

(iii) under Count X (breach of covenant of quiet enjoyment), against Defendants Venice MD, LLC, and Hagerstown Maryland, LLC, jointly and severally, in the amount of $220,050.48;

(iv) under Count XI (breach of third party provisions in the lease agreement), against Defendants Venice MD, LLC, and Hagerstown Maryland, LLC, jointly and severally, in the amount of $167,500.00;

(v) under Count XII (interference with a contract), against Defendants Venice MD, LLC, and Hagerstown Maryland, LLC, jointly and severally, in the amount of $167,500.00;

(vi) for the prejudgment interest on the damages awarded under Count X, calculated at 6% per year for three years plus $36.17 per day for 17 days, against Venice MD, LLC, and Hagerstown Maryland, LLC, jointly and severally, in the amount of $40,223.98; and

(vii) under the counter-claim brought by the Defendants (to offset the back taxes paid on the liquor license), Defendants are not entitled to relief and judgment is entered for the Plaintiff.

B. *For the Defendants*

(i) under Count III (declaratory judgment regarding rent payment due dates), the Plaintiff is not entitled to relief and judgment is entered for Defendants;

(ii) under Count IV (specific performance of the Lease), the Plaintiff is not entitled to relief and judgment is entered for Defendants;

(iii) under Count VI (equitable subrogation), the Plaintiff is not entitled to relief and judgment is entered for Defendants;

(iv) under Count VII (equitable recharacterization), the Plaintiff is not entitled to relief and judgment is entered for the Defendants; and

(v) under Count XIII (fraud), the Plaintiff is not entitled to relief and judgment is entered for the Defendants.

The damage awards in Counts IX, XI, and XII are concurrent rather than consecutive. Accordingly, a dollar paid toward the judgment on any of these counts will also be applied dollar for dollar towards the judgments on the other counts. The damage award in Count X will be consecutive to the awards in Counts IX, XI, and XII. Each side is to bear its own costs.

The Court DIRECTS the clerk to CLOSE the CASE.